## J. WILLIAM CHILTON, Appellant, v. WILLIAM I. METCALF et al.

### Division One, March 31, 1911.

1. **BANKRUPTCY SALE: To Assignee's Father: Bona Fides: Not Pleaded.** Where defendant was assignee in bankruptcy in 1876, and as such sold the lands in suit to his father, and made report to the court, charging himself with the amount, and was discharged, and the father afterwards conveyed to him, and no objection to the sale was made in the Federal court, the good faith of the sale—there being no pleading by the plaintiff, who is the grantee of the bankrupt, raising the question of good faith, and no testimony that the bid of the father was a covinous contrivance whereby defendant, the assignee, bought at his own sale—will be put to one side, as not for consideration.

2. **INSTRUCTIONS: Equitable Proceeding: Quieting Title.** Instructions do not fill a recognized office in an equitable proceeding; and a suit having for its purpose the setting aside of a deed under which defendant claims and to remove a cloud on plaintiff's title, is such a proceeding.

3. **EVIDENCE: Copy of Deed.** Admitting the copy of a deed in evidence without accounting for the original, if error at all, is not reversible error.

4. **BANKRUPTCY: Assignee: Appointment by Register: Approval by Court: Record Showing Lost Papers.** The Bankruptcy Act of 1868 provided that if there are no opposing interests the reg-

Chilton v. Metcalf.

ister should appoint the assignee, and that "all appointments of assignees shall be subject to the approval of the judge." *Held*, that the law does not say the appointment is subject to approval by the court, but by the judge, who might make it in chambers or vacation, and by writing his approval on the register's written appointment, or other memorandum; and, as the law did not require such approval to appear by an order of record, it will not be held that, because no memorandum of the judge's approval can be found among the files of papers more than a quarter of a century after the appointment was made, the appointment was never approved. Land titles will not be unsettled because of the mere absence of papers from musty files.

5. ———: ———: ———: ———: **Presumption.** In the absence of proof one way or the other, it will be presumed, in a collateral attack, that an officer performs his duty. Where the records show the continuous performance of the statutory duty of an assignee for several years, whereby an estate is fully administered, it will be held, in the absence of any memorandum of approval, that the register's appointment of the assignee was approved by the judge.

6. ———: ———: ———: ———: **Conveyance of Land to Assignee.** The Bankruptcy Act of 1867 provided that if there were no opposing interests, the assignee should be appointed by the register, "subject to the approval of the judge;" that as soon as appointed and qualified, the judge, or where there were no opposing interests the register, should, under his hand, assign and convey to the assignee all the estate, real and personal, of the bankrupt; and that thereupon, "by operation of law," the title to all such property vested in the assignee. *Held*, that, the record showing such an appointment by the register, and such a conveyance by him to the assignee, it will be presumed in a collateral proceeding, in the absence of all memoranda or evidence to the contrary, where the estate was fully administered, that the judge approved the appointment of the assignee, and that the transfer and assignment by the register was operative to convey the title to land to the assignee.

7. ———: **Advertising Sale: Designating Paper.** The Bankruptcy Act of 1874 required "the judge" to designate the paper in which notice of sales of land by assignees should be published. *Held*, that this did not require the court to designate the newspaper by an order of record, but it could be done by the judge in chambers, and his act could be evidenced by a written order or memorandum attached to or indorsed on another paper or lodged with the files; and in the absence of any such memorandum among the files a generation afterwards, it will not be held that the judge did not designate the paper, nor will it be held that it was essential that his designation should have been a matter of record entry.

8. ——————: ——————: **Two Papers Designated: Proof of One Found.** Where two newspapers were designated, and proof of publication in only one is found among the files, but there is satisfactory internal evidence in the report of the sale and memoranda of disbursements that a proof of publication in the other was originally attached to the report, it will not be held that the notice of sale was not published in both.

9. ——————: **Confirmation by Court.** It will not be held in a collateral proceeding, that a sale of real estate by the assignee in bankruptcy was invalid and passed no title, simply because an affirmative order of court approving the sale is not shown by the assignee's grantee. Especially should that be the ruling where there was a minute book, which was not offered in evidence, and in which such order might properly have appeared.

10. ——————: **General Orders in Bankruptcy: Minute Book: Presumption.** Where the statute empowered the justices of the U. S. Supreme Court to frame general orders regulating the practice and procedure in bankruptcy matters, and the "General Orders in Bankruptcy" framed by them contemplated a separate "minute book," it will be presumed that such minute book was kept in the absence of testimony one way or another, and it will not be assumed that such book did not contain an order confirming the assignee's report of the sale of lands.

11. ——————: **Confirmation by Court: Fortified by Other Facts.** Where the assignee in bankruptcy sold the lands, made report of the sale to the court, handed it to the judge "for confirmation," who wrote on it, "Sale Confirmed," and thereafter the court assumed jurisdiction of the proceeds of the sale, disbursed them as the law provided, approved the settlement of the assignee showing receipts and disbursements, and finally adjudicated that the estate was fully and properly administered, these enumerated matters, necessarily passing under the eye of the court, fortify the conclusion that the court approved and confirmed the assignee's sale of the lands, in the absence of a showing to the contrary.

12. ——————: **After Great Lapse of Time.** It is the wholesome and settled policy of the law to uphold judicial sales after a great lapse of time, during which files or records may be lost, mislaid or destroyed.

13. ——————: **Title Vested in Assignee.** The title to the bankrupt's property vested in the assignee by operation of the register's deed of assignment, *ipso facto*, under the Act of 1867; and where the bankrupt was wholly insolvent, and the assignee sold the property and there was no surplus of proceeds, the legal title passed by the assignee's deed to the purchaser, or else (by rea-

son of some irregularity in the sale) the equitable title superior to the legal title passed; and thereafter, the bankrupt had neither and could legally convey neither.

Appeal from Shannon Circuit Court.—*Hon. W. N. Evans,* Judge.

AFFIRMED.

*J. W. Chilton* and *James Orchard* for appellant.

(1)   Under the bankruptcy law of 1867, an assignee in bankruptcy could not act until his appointment or election had been approved of record by the court in which the proceedings were pending; and until such approval was made a register could not assign the bankrupt's effects to the assignee. 14 U. S. Stat. at Lar. 517, sec. 13; In re Scheiffer, Fed. Cas. No. 12,447, 21 Fed. Cas. 657; Ex parte Bryan, Fed.. Cas. No. 2,061, 4 Fed. Cas. 499; 16 Am. and Eng. Ency. Law (2 Ed.) 716, par. e; Kleber's Void Judicial and Ex. Sales, sec. 473, p. 423.   (2)   Said bankruptcy law, and the amendment of June 22, 1874, required that an intended sale of lands of the bankrupt should be advertised three consecutive weeks in a newspaper or newspapers, designated by the court, or judge thereof; and a sale made without such notice was unauthorized and void and passed no title. National Bankruptcy Act, June 22, 1874, sec. 4; In re Hunter, Fed. Cas. No. 6,903, 12 Fed. Cas. 951; 17 Am. and Eng. Ency. Law (2 Ed.) 966-967; State ex rel. v. Baldwin, 109 Mo. App. 573; Melton v. Fitch, 125 Mo. 290; Otis v. Epperson, 88 Mo. 131.   (3)   The designation of the Cleveland Daily Herald and Western Reserve Chronicle, by Keith, register, as papers in which to publish notice of appointment of assignee, was not a designation of said newspapers to publish notice of sale of property. National Bankruptcy Act,

March 2, 1867, sec. 14, U. S. Stat. at L. 517. (4) And even if the register in bankruptcy had authority to designate the newspapers in which such notice of sale should be published and did designate the Western Reserve Chronicle and Cleveland Daily Herald, for that purpose, a sale of said land by such assignee was unauthorized and void, unless such sale was advertised in both said papers. In re Hunter, supra; State ex rel. v. Baldwin, 109 Mo. App. 573. (5) The pretended sale of said land by Wm. I. Metcalf was invalid and void, and passed no title because not approved or confirmed by the court. National Bankruptcy Act, June 22, 1874, sec. 4; In re O'Fallen, 18 Fed. Cas. 600 (2 Dill. 548); In re Ewing, Jr., Bankrupt, 16 Fed. 753; Ex parte Bryan, supra; Osborn v. Baxter, 58 Mass. (4 Cush.) 406; Chase v. Van Meter, 140 Ind. 321; 17 Am. and Eng. Ency. Law (2 Ed.) 989; 16 Ib. 748; In re Gilton, 3 Biss. (U. S.) 144; Clark v. Sires, 193 Mo. 506; Bruden v. Taylor, 124 Mo. 17; Hancock's Appeal, 86 Mo. App. 14; Garner v. Tucker, 61 Mo. 432; Noland v. Barrett, 122 Mo. 181; Gulf Coast Canning Co. v. Foster, 17 So. (Miss.) 683. (6) And a deed made before the approval of such sale is void, and conveys no title. Clark v. Sires, 193 Mo. 506; Bruden v. Taylor, 124 Mo. 17. (7) The approval of such sale (as well as the approval of the appointment or the election of assignee and designation of newspapers for advertising the sale) must appear from the record. Such approval cannot be presumed. A court can speak through its records only. In re Scheiffer, 21 Fed. Cas. 657; Ex parte Bryan, supra; Clark v. Sires, 193 Mo. 506; Cummings v. Brown, 181 Mo. 718; State to use v. Scott, 31 Mo. 131; Maupin v. Franklin County, 67 Mo. 329; Kleber's Void Judicial and Ex. Sales, sec. 391, p. 348. (8) An unauthorized, unsigned, undated notation on the back of report of sale, "Sale confirmed and deeds ordered," is not an approval nor record of approval of a sale. Ex parte Bryan, supra; In re Scheiffer, supra; Clark v.

Sires, supra; Cummings v. Brown, supra; Coonce v. Monday, 3 Mo. 373. (9) Nor does the settlement and discharge of the assignee operate as an approval of sales made by him. Melton v. Fitch, 125 Mo. 290; Clark v. Sires, 193 Mo. 506. (10) The clerks of U. S. District Courts, which had jurisdiction of bankruptcy proceedings under the national bankruptcy laws of 1867 and 1874, were required by law to keep a record "of all orders, decrees, judgments and proceedings of said courts." R. S. of U. S., sec. 794, 4 Fed. Stat. Ann. 75; National Bankruptcy Act, March 2, 1867, secs. 4 and 38; In re Scheiffer, supra; Ex parte Bryan, supra; In re Alexander, 1 Fed. Cas. 354. (11) Sales made by assignees in bankruptcy were judicial sales. National Bankruptcy Act, March, 1874, sec. 4; Kleber's Void Judicial and Ex. Sales, secs. 5 and 15, chap. 1; In re Ewing, supra; Leard's Appeal, 164 Pa. St. 435; Chase v. Van Meter, 140 Ind. 321; In re O'Fallen, 2 Dill. 548; Stephens v. Palmer, 10 Bosw. 60; Dresback v. Stein, 41 Oh. St. 701; Hancock's Appeal, 86 Mo. App. 14. (12) The rule of caveat emptor applies in its pristine vigor to the sales of land in bankruptcy proceedings under the law of 1867-1874; and the purchasers were chargeable with notice of all defects in such proceedings. Ex parte Bryan, supra; Alexander v. McCullough, 1 Weekly Notes, Case 609; Osborn v. Baxter, 58 Mass. (4 Cush.) 406; Gulf Coast Canning Co. v. Foster, 17 So. (Miss.) 684; Kleber's Void Judicial and Ex. Sales, sec. 464, p. 416. (13) Assignments in bankruptcy under the National Bankruptcy Law of 1867 and 1874, were in trust; and lands not lawfully sold or disposed of by the assignee reverted to the bankrupt and vested in him. King v. Remington, 36 Minn. 15; Taylor v. Irwin, 20 Fed. 615; Burton v. Perry, 146 Ill. 71; Smith v. Gordon, 22 Fed. Cas. 556; Osborn v. Baxter, 58 Mass. (4 Cush.) 406; 16 Am. and Eng. Ency. Law (2 Ed.) 741; Warner v. Howe, 44 Ill. App. 157.

(14)  It was error to admit the record of the assignee's deed from Wm. Metcalf to Robert Metcalf, without proof of loss of the original, or accounting for its non-production at the trial.  Smith v. Phillipps, 25 Mo. 555; Sheehan v. Ins. Co., 53 Mo. App. 355; Blandeau v. Sheridan, 81 Mo. 556; Sims v. Gay, 66 Mo. 613.

*James D. Lindsay* for respondents.

(1)  The adjudication in bankruptcy of Warner, the reference of the further proceedings by the court to the register, the appointment and qualification of the assignee, and the conveyance by the register to the assignee, divested said bankrupt of all title to the lands, and vested title in the assignee.  Bankruptcy Act 1867, secs. 4, 13 and 14; Rules of Supreme Court of United States, 1874, V. X.; Hills v. Alden, 2 Hask. 299; In re Mott, 6 Fed. 685; Crowley v. Hyde, 116 Mass. 589; Tuite v. Stevens, 98 Mass. 305; In re Burke, 15 N. B. R. 40.  (2)  The filing of the petition in bankruptcy operated as an attachment of the bankrupt's property; the adjudication passed it finally into the custody of the court; and the reference to the register, vested the title in him for conveyance to the assignee.  Mueller v. Nugent, 184 U. S. 1; In re Wells, 114 Fed. 222; McFarlan v. Wells, 99 Mo. App. 641.  (3).  The title being divested out of the bankrupt, the lands sold, the proceeds applied upon his debts; the bankrupt discharged from his debts; and his debts remaining almost wholly unpaid, the title could not revert to him.  Scruby v. Norman, 91 Mo. App. 517; Perry v. Carnes, 86 Mo. 652; Vanslyke v. Shryer, 98 Ind. 126; Atwood v. Thomas, 60 Miss. 162; Pickens v. Dent, 106 Fed. 653; Boyd v. Olms, 82 Ind. 294; Berry v. Gillis, 17 N. H. 9; Seaton v. Hinneman, 50 Ia. 395; Dessan v. Johnson, 66 How. Prac. 6; Peters v. Wallace, 4 S. W. 914; Foraast v. Hyman, 28 N. E. (Ill.) 801; Conner v. Ex-

234 Sup.—3

press Co., 42 Ga. 37; Malone v. Martin, 2 S. W. 909; Herbst v. Bates, 13 Weekly Law Bulletin, 565; In re Alden, 16 Nat'l Bankruptcy Register, 39. (4) The register had authority, under the Act of 1867, and under the Rules of the Supreme Court of the United States, 1874, to sit in chambers, and dispatch the administrative business of the court. He could do all the things necessary to be done in administrative and uncontested matters, and could make all necessary orders in bankruptcy, except only such as were by the act itself specifically required to be made or done by the court. Bankruptcy Act, 1867, sec. 4; Rules Supreme Court U. S., 1874; Hills v. Alden, 2 Hask. 299; In re Burke, 15 National Bankruptcy Register, 40. (5) It was not essential to the validity of the sale that it should be confirmed by an order of record of the court. The act gave the court "upon application of any party in interest," complete supervisory power over sales, including power to order a resale. Bankruptcy Act 1867 (Amended 1874), sec. 15; In re Alden, 16 National Bankruptcy Register, 40. (6) If, however, confirmation by the court was necessary, then such confirmation abundantly appears from the record. No formal order, nor special form of words, was necessary. The report of sale, the other various reports of the assignee, charging himself with the money received from the sale of the land, his final report, showing such receipt, followed by the final order of record of the court, finding that he had fully and completely administered said estate, and ordering that proceedings be discontinued, constituted a complete and indubitable confirmation of the sale by the court. 17 Am. and Eng. Ency. Law (2 Ed.) 991; Agan v. Shannon, 103 Mo. 661; Grayson v. Weddle, 63 Mo. 523; Camden v. Plain, 91 Mo. 117; Henry v. McKerlie, 73 Mo. 416; Jones v. Manley, 58 Mo. 559; State ex rel. v. Hurt, 113 Mo. 97; Gilbert v. Cooksley, 69 Mo. 42; Long v. Joplin Mining Co., 68 Mo. 422; State ex rel. v. Evans, 176 Mo. 310.

(7)  It is the policy of the law to uphold judicial sales, and courts will not be astute in finding reasons for overthrowing them. 17 Am. and Eng. Ency. Law, 994; Evans v. Robberson, 92 Mo. 192. And especially is this so, after a great lapse of time, during which files may be lost or destroyed. Agan v. Shannon, 103 Mo. 668; Price v. Real Estate Assn., 101 Mo. 107.  (8)  The judgment will not be reversed because the record of the deed from the assignee to Robert Metcalf was admitted in evidence. Smiley v. Cockrell, 92 Mo. 105; Ivy v. Yancey, 129 Mo. 508.

LAMM, J.—Plaintiff sued under section 650 (now R. S. 1909, sec. 2535, as amended), in the Shannon Circuit Court in 1906, to determine and quiet title to the northwest quarter and the north one-half of the southwest quarter and the southeast quarter of the southwest quarter, all of section 18, and the north one-half of section 8 and the south one-half of section 17, in township 30, range 2, in Shannon county—his petition alleging his ownership and title in fee simple and that defendants severally make some adverse claim of title. The prayer is conventional.

Metcalf, sued as a non-resident, appears and answers, admitting his claim of title and denying plaintiff's. Jacoby and King make default.

From a judgment in Metcalf's favor, finding and decreeing him sole legal and equitable owner, that neither plaintiff nor defendants Jacoby or King has any interest or title, and barring each of them from thereafter setting up or making any claim, etc., plaintiff appeals.

One Warner is the common source of title—he owning the land in February, 1876. While such owner, in that month, he is adjudged an involuntary bankrupt by the U. S. District Court for the Northern District of Ohio, sitting at Cleveland. To that end, when the bankruptcy petition is filed, he waives in writing

the making and service of any order to show cause and a copy of the petition, and consents to an adjudication of bankruptcy, which then follows. That proceeding is under the Bankrupt Act of 1867 as amended in 1874.

The record shows that the rules, procedure and official machinery of the then bankrupt court under the old bankrupt act are set in motion to administer upon Warner's estate, that machinery including an official known as a "register," Keith, and one known as an "assignee," Wm. I. Metcalf; that said register makes written assignment and conveyance of the bankrupt's effects to said assignee in March, 1876; that the only assets, worth while, are wild trading lands in Oregon and Shannon counties, Missouri (including that in controversy), of no known or settled value; that the assignee makes a bankrupt sale of said lands at public auction in March, 1878; that Robert Metcalf, is the highest and successful bidder for part of the lands in Shannon and part of those in Oregon and they are struck off to him; that the assignee makes report of sale, charging himself with the price bid by Robert Metcalf, viz., $289.80, and follows that report with a deed to him of date of April 11, 1878, and put of record; and that purchaser in 1886 conveys by a recorded deed to Wm. I. Metcalf in consideration of "one dollar as well as other valuable considerations."

Such, in brief, is the paper title of defendant Metcalf.

In September, 1876, Warner is adjudged entitled to his discharge as a bankrupt and is ordered discharged from his debts. In 1880 the estate is closed by the following entry:

IN THE DISTRICT COURT OF THE UNITED STATES, FOR THE
     NORTHERN DISTRICT OF OHIO.

In re matter of
     Jacob B. Warner,     } Bankrupt.
          Bankrupt.

          At Cleveland, in said District, on the 19th day of July, A. D.
     1880, before the Honorable Martin Welker, Judge of said Court:
          It appearing to the Court that Wm. I. Metcalf, Assignee of
     said Bankrupt's estate, has fully administered upon and settled
     the said estate; it is ordered that no further proceedings be had
     herein and that this matter be duly recorded.
          Witness, the Honorable Martin Welker, Judge of said Court,
     and the seal thereof, at Cleveland, in said District, this 19th day
     of July, A. D. 1880.                    EARL BILL, Clerk.
     (Official Seal.)                By Geo. Wyman, Deputy Clerk.

Twenty-six years later, viz., in 1906, Warner, the
discharged bankrupt, quitclaims his interest in the
land to plaintiff, Mr. Chilton, in consideration of $100
in hand paid. That deed is spread of record and pres-
ently the grantee under that deed brings suit with
the said result.

Such is the paper title of plaintiff and the case in
rough outline.

Learned counsel for plaintiff state the questions
on which they ask our judgment to be these: "The
vitality of this alleged bankruptcy sale of the lands in
controversy is the principal question involved in this
appeal. The only other question is as to the action of
the court in admitting the record of the deed from
Wm. I. Metcalf to Robert Metcalf without a proper
foundation therefor."

If further record facts are needful to under-
stand or determine those questions such facts will ap-
pear presently.

I. *Of certain subsidiary questions.*

Although main propositions are formulated as
above briefs broadly include, *arguendo,* incidental and
collateral questions seeking disposition at the thresh-
old. We group those of them worthy of attention
under this head.

(1)   Defendant Metcalf is the identical person
who was assignee of the Warner bankrupt estate in
the 70's.   That fact is injected by way of coloring mat-
ter or makeweight.   It is advanced as entitled to some
equitable consideration.   But we put it to one side, to-
gether with the additional fact that the successful bid-
der at the assignee's sale, Robert Metcalf, was the
father of the assignee.   We take that course, because
there is no charge in the petition raising the question
of the bona fides of that sale, nor is there any testi-
mony showing the bid of the father was a covinous con-
trivance whereby in point of fact the son, the assignee,
bought at his own sale in violation of the obligations of
his trust and in contravention of precepts of law.
Nearly thirty years have passed since that sale and
deed.   The Bankrupt Law of 1867, itself dead and about
forgotten, gave power to the district judge on the ap-
plication of interested parties to order a new sale on
sufficient grounds appearing.   With that road wide
open to such timely and effectual remedy, no in-
terested party moved in that behalf while the matter
was *in fieri*.   Apparently they all acquiesced in the
sale and accepted the fruits thereof, small as they
were.   In that view of it, plaintiff, who holds by quit-
claim deed and stands in the shoes of Warner, can
with ill grace make the point even if the pleadings
were broad enough to raise the issue.

(2)   As we grasp it, some stress is laid on the fact
the bid was small and that the dividend paid by the
assignee was much less than one cent on the dollar of
the indebtedness proved up against the estate of War-
ner.   There were two other successful bidders for por-
tions of the Missouri land.   The bid of Metcalf was not
out of proportion to the others.  By going on the ground
the assignee took steps to inform himself of the value
of the land and reported it had "no fixed value;" that
it was "suitable only for trading purposes;" that it
had been twice advertised and offered for sale and that

the bids offered were the best he "could obtain." It is
a fact of common knowledge that because of drainage,
railroads, lumbering interests, mineral prospects and
an informed knowledge of the water power, climate
and soil of southeast and southern Missouri, so great
betterment has been made in land values in that region
that it is hard to put oneself back in the 60's and 70's
and get at going prices from then existing environ-
ment, but it is necessary to do so to see facts in their
true perspective. The records and files of this court
tell the miserable story of the short-sighted view taken
of the value of many of those lands generations ago,
whereby the generous endowment made by the general
government to public schools in swamp lands, a most
princely and munificent gift, was quite frittered away
and lost. Not infrequently owners of those lands
abandoned them rather than pay taxes on them. Not
infrequently were they hawked about by peripatetical
land traders who used them to bait hooks in fetching
bargains in dickers with the unwary and uninformed.
The facts must be viewed in the light of former days
and not in the light of the present auspicious time.
So viewed and considered in this suit, where the plead-
ings tender no issue of that sort, we can put no ap-
preciable stress on either the amount bid for the
land or the dividend paid Warner's creditors.

(3). The consideration paid by plaintiff was less
than that paid by the bidder at the assignee's sale and
counsel for Metcalf comment on that fact by way of
counter stroke, but, in disallowing plaintiff's conten-
tion, as above, we give no force to said parry or count-
er stroke of his adversary. The only significance we
could attach, at very first blush, to the small considera-
tion in plaintiff's deed would be that he bought a law-
suit for a price, viz., $100, under color of paying that
sum for this large body of land; and that he thereby
put his own outspoken financial estimate on the worth

of his speculative venture, viz., risked the hundred on his chance of winning.

(4). Certain instructions were asked by plaintiff and refused. He assigns error on that score. We put this assignment away from us because this is not a lawsuit in which instructions fill a recognized office. In its nature it is an equitable proceeding. At bottom it seeks to set aside the deeds under which Metcalf holds and to remove a cloud on plaintiff's title—a matter of equity cognizance. Its life is, *first,* to determine title, and, *second,* to quiet title and to bar and preclude defendants from setting up any further claim. In the last aspect, it was a bill of peace also invoking equitable principles. We think the merits of the controversy must be sought elsewhere than in the action of the court in ruling on instructions. [Stone v. Perkins, 217 Mo. l. c. 601 *et seq.*; Hutchinson v. Patterson, 226 Mo. l. c. 182 *et seq.*; Lee v. Conran, 213 Mo. 404; Hudson v. Wright, 204 Mo. l. c. 423 *et seq.*]

(5). It is argued by plaintiff's learned counsel that Metcalf would probably be entitled to a lien on the land for the original purchase price with interest thereon, but (they say) that question is not here on the pleadings on this appeal. That view of it will be considered presently.

The disposition made of the foregoing questions brings us to the two propositions relied on by plaintiff as heretofore stated.

II. Did the court err in allowing in evidence the record of the deed from Wm. I. Metcalf, assignee, to Robert Metcalf? We rule that error, if error at all, was not reversible error.

The identical question was ruled in Ivy v. Yancey, 129 Mo. l. c. 508. On the authority of Smiley v. Cockrell, 92 Mo. l. c. 113, in the Ivy case it was held ''that we will not reverse a judgment on the ground alone of this error,'' thereby referring to admitting a copy of

the deed without laying proper foundation, which is the point raised here.

III.  Plaintiff's main proposition is that there were such irregularities and defects in and about those proceedings of the bankrupt court, leading up to the sale, that the title was not conveyed by the assignee's deed, and that by operation of law that title was left in or reverted to the bankrupt and was finally conveyed by his quitclaim deed in 1906 to plaintiff.

That proposition, an aggregation, is treated by counsel in their brief under a dozen or more subheads. An understanding of contentions *pro* and *con* seeks more of the record facts, viz.:

The record shows that Warner's adjudication of bankruptcy, *inter alia,* ordered that the petition be referred to Keith, register in bankruptcy, "to take such other proceedings therein as are required by said act," meaning thereby the Bankrupt Act of 1867 theretofore referred to in the adjudication.  Presently, Keith, as register, notified Metcalf in writing that he was "duly chosen and appointed assignee of the estate and effects" of the bankrupt.  On the same day Metcalf, in writing, accepted "the trust of assignee of the estate" of the bankrupt.  Presently, an abstract of the proceedings returned by the register to the clerk of the district court (and now on file there) shows that the assignee filed with the register his bond, which bond was approved by him, shows that the register made an assignment and conveyance of the bankrupt's effects to the assignee and delivered the same to him together with a certified copy of a creditor's list and certain schedules made by the bankrupt and that the register ordered the assignee to publish notice as required by law in the Cleveland Daily Herald and the Western Review Chronicle.  There appears in the same files an appraisement of the bankrupt's estate under oath of three disinterested freeholders.  In that

appraisement (under the title "real estate") appears
the land in Oregon and Shannon counties, Missouri.
Of this land the appraisers say they cannot make a
true appraisement because they have no means of
knowing its actual or approximate value.   In those
files also appears the assignee's report of sale, di-
rected to the Hon. Martin Welker, judge of the court,
for confirmation.   As part of that report is the sale
notice describing the land, where situate, the terms of
sale, the fact that the taxes are paid, when and where
the sale is to be made, etc.   The report, among other
things, states the sale was made at public auction, pur-
suant to notice by publication in the "Western Re-
view Chronicle, *as hereto attached;*" that the named
purchasers were the highest bidders, the names of the
purchasers and lands purchased by them are then set
forth.   That report is headed as follows:

"HON. MARTIN WELKER,

Dear Sir:

*I hand you herewith for confirmation* report of
sale of wild lands in Missouri in re Jacob B. Warner.
The lands are assessed for taxation purposes at one
dollar per acre, but so far as I have been able to learn
from enquiry and correspondence, have no fixed value,
and suitable only for trading purposes, and after twice
advertising and offering at two separate and different
times, the prices for which the lands were sold were
the best I could obtain.

"Respectfully,

"W. I. METCALF, Assg."

The report, signed by W. I. Metcalf, assignee for
Jacob B. Warner, bears this indorsement in ink:  "No.
1425.   In re J. B. Warner, Bankrupt.   In Bankruptcy.
Assignee's Report of Sale of Lands.   Filed April 11,
1878.   (Signed) Earl Bill, Clerk."   It also bears the
following indorsement in pencil:  *"Sale confirmed and
deeds ordered.   (Signed) W."*—*W* being the initial
letter of Welker, the name of the judge of that court.

Another abstract of proceedings returned by the register to the clerk shows that in March, 1878, the assignee filed with him a monthly report of receipts and disbursements in which he accounts for the several sums received from the respective purchasers of Missouri lands at the bankrupt sale—among them, Robert Metcalf, who paid $289.80 as the amount of his bid for the land in controversy. The account of receipts and disbursements, aforesaid, for the month of March, 1878, shows a similar item. The report of sale refers to the sale as made at public auction "pursuant to notice by publication in the Western Review Chronicle *as hereunto attached.*" No such proof of publication was found "attached" when these old files were examined to prepare for the trial of this case. The files, however, do show a proof of publication of the same notice of sale in the Cleveland Herald for three times consecutively. The same files show a receipted bill from the proprietors of the Western Review Chronicle for publishing the notice of sale. The Bankrupt Act of 1867 provides for the publication of a certain notice when the assignee submits his accounts to the court and files the same. That notice was given. The final account of Metcalf as assignee shows he charged himself with the money received from the sale of the Missouri lands and took credit for certain disbursements, leaving a small balance to be disbursed by way of dividends. Presently, the order of the court finding the estate fully administered and settled and ordering that no further proceedings be had "and that this matter be duly recorded," which order bearing date, July 19, 1880 (Note: It has been heretofore set forth in this opinion), was entered.

Plaintiff took the deposition of the present clerk of the United States District Court for the Northern District of Ohio, Carlton. When Bill ceased to be, or when Carlton became, clerk is dark. Carlton testified that he is custodian of such of the records of the bank-

ruptcy court of the Northern District of Ohio as came into his hands under the bankruptcy law of 1867-74. Asked what records came into his possession, he said he could not say, but he had the "record which contains the case of Jacob B. Warner" which was commenced in February, 1876, No. 1425, and which record is a certain bankruptcy docket, No. 5, containing cases from No. 1316 to No. 1515. He was familiar with no record entries except what appeared on that docket. Asked if there was an order made by the judge appointing Metcalf assignee or an order by the judge approving his appointment as assignee, he said he had not examined. Requested to examine and testify in that behalf, he said he found no entry "in the record on this docket" of that appointment or approving the appointment. He was asked to examine "said docket" and state whether he found an entry of record made by the court or judge approving or confirming a sale of the lands in dispute (describing them) by Metcalf, assignee. To that request his answer was that the record shows the assignee's report of the land sales was filed, that it would not in any way give a description of the land, but that the report might. He also stated that so far as he was able to discover there was no entry on the record of approval by the court of the assignee's sale of the land. Asked to be sure about that, his reply was, he could find no such entry. On cross-examination he testified that the book he held in his hand was a book of record in which all entries pertaining to the case "are supposed to be made." "It just shows the journal, the papers that are filed in the case, without going into specific detail of the material matter in the paper." That he had not undertaken to state what papers were filed in the bankruptcy of Warner, that his answer was given with reference solely to the docket where the entries appeared. Further cross-examined, he stated there was among the files a paper notifying the assignee of his appointment and relating

to his bond, another entitled "Assignee's Inventory and Appraisal of Assets," another entitled "Assignee's Report of the Sale of Lands," and another entitled "Assignee's Final Account." Re-examined in chief, he stated that so far as he could discover there was no designation by the court of a newspaper in which the assignee is directed to publish a notice of the sale of the lands in the Warner bankrupt estate. On re-cross-examination, he was asked if he found on said docket any references to the assignee's report of sale of the land of the Warner estate, and answered that he found an entry on the docket in words and figures as follows: "April 11, 1878. Assignee's Report of Sale of Lands Filed." And under date of October 22, 1878, he found the following entry: "Register's abstract adj. final meeting filed and returned, 13—433."

"Lists of claims with dividend filed, 15 proofs of debt, warrant, appointment and bond of assignee, exemptions, two appraisals, notice and request of assignee, 10 assignee's reports, and assignee's final return filed."

(a). It is argued for plaintiff that under the bankrupt law of 1867 an assignee could not act until his selection was approved of record by the court in which the proceedings were pending, and that until such approval a register could not assign a bankrupt's effects to the assignee.

In our case the register appointed the assignee and approved of his bond. Section 13, of the act (14 U. S. Stat. at L., p. 522) provides that if there are no opposing interests the register shall appoint an assignee; that if within five days thereafter such assignee fails to express in writing his acceptance of the trust, the judge or register may fill the vacancy. Then follows this: "All elections or appointments of assignees shall be subject to the approval of the *judge*," etc. The law does not say the appointment is subject to the approval of the *court*, as contended, but of the

"judge." It does not say the approval must appear by an order of record. Many ministerial and administrative features of the old bankrupt act were administered by acts done in chambers by the judge, and appeared only by way of indorsement on or a signed memorandum attached to papers, or by way of orders signed and filed. The approval of a bond (where that is required) or the approval of the appointment of an assignee (where that is required) might so appear, we think, without being formally evidenced by an entry on the record. In the case at bar the deposition of the present clerk was taken. His examination was confined to a certain "docket, No. 5," and to certain papers discovered among the files and exhibited to him. Let it be assumed that no memorandum of approval by the judge was found among the papers or files, yet, in getting to a just conclusion, it would be folly to overlook the fact that the search of those files was made more than a quarter of a century after the case was disposed of. The good sense of the thing tells us that papers are lost, stolen or mislaid and that it would create havoc and distress, without any compensating benefit whatever, to hold that the mere *absence* of a paper from the musty files and records of cases under the old bankrupt act, *ex proprio vigore,* unsettled or overturned land titles. [Griffin v. Franklin, 224 Mo. l. c. 683, *et seq.*]

Absent proof one way or the other a strong presumption arises that an officer performs his duty. What say the maxims? All things are presumed to be lawfully done, until proof be made to the contrary. All things are presumed to have been rightfully and duly performed, until it is proved to the contrary. [Chlanda v. Transit Co., 213 Mo. l. c. 261, *et seq.*] Peradventure, the acts of a Federal judge administering the Bankrupt Law of 1867 are attended with that presumption and clothed thereby as with a right warm frock of protection. Absent a memorandum of ap-

proval and present the visible and continuous perform-
ance of the statutory duty of an assignee for several
years—all this, too, under the eye and supervision of
the judge, court and register—whereby a trust estate
is fully administered, we must conclude the appoint-
ment of such assignee was in fact approved as re-
quired by the law. Does not such course of procedure
quite unerringly hark back to an assignee, *de jure*,
as well as *de facto?* To an assignee at least *pro hac
vice?* In our opinion no other view of it would be sen-
sible as practical and safe in judicially dealing with
ancient matters subjected to collateral attack.

By section 14 of the Bankrupt Act of 1867 it was
provided that as soon as the assignee was appointed
and qualified, the judge, or where there was no oppos-
ing interest, the register was required by an instru-
ment under his hand to assign and convey to the as-
signee all the estate, real and personal, of the bank-
rupt, etc. Thereupon, "by operation of law," the ti-
tle to all such property vested in the assignee, sub-
ject to certain exemptions not material here. Such as-
signment was executed here.

The premises all in mind, we rule that for the pur-
poses of the bankrupt act, the assignee was appointed;
that his appointment must be taken as approved; and
that the transfer and assignment by the register was
operative to convey the bankrupt's title in his Mis-
souri land to that assignee. Therefore, we disallow
the point to plaintiff.

(b). The clerk with "Docket No. 5" before him
failed to find an order designating a newspaper in
which to publish the sale notice. In that condition of
things it is contended there is no evidence that the
"court or judge" thereof designated the newspaper
in which to publish the notice of sale; therefore, the
sale was unauthorized and void.

In section 4 of the Bankrupt Act of 1874, amend-
ing the Act of 1867 (Pt. 3, vol. 18, U. S. Stat. at L.,

p. 178), we find, among other things, this: "All notices of public sales under this act by any assignee or officer of the court shall be published once a week for three consecutive weeks in the newspaper or newspapers, to be designated by the judge, which, in his opinion, shall be best calculated to give general notice of the sale." Here again, as in paragraph (*a*), the court as a court is not required to do anything. The individual *judge* acts and his acts in chambers, according to the usual course of carrying out the administrative features of the Bankrupt Law, may be evidenced by a written order or memorandum attached to or indorsed on another paper or lodged among the files. These files are open to inspection of the public, subject to being handled, liable to loss, theft, mislaying or destruction, and if a search of those files more than a generation afterwards fails to discover the administrative and ministerial order or memorandum designating the newspaper, it would not do to hold that such fact alone avoided the sale. Especially so, in the teeth of the presumption attending the official acts of judges as well as other officers that they performed their duty by tracking the law.

In this connection it is not amiss to say that if an entry of record designating a newspaper was necessary (which we by no means hold), yet it is not clear that Carlton had before him while testifying all the records of the bankrupt court covering the period of the pendency of the Warner Case. He held in hand and was questioned about "Docket No. 5." Now, the Bankrupt Act (14 U. S. Stat. at L., sec. 38, p. 535), provides, among other things, that "the proceedings in all cases of bankruptcy shall be deemed matters of record, but the same shall not be required to be recorded at large, but shall be carefully filed, kept, and numbered in the office of the clerk of the court, and a docket only, or short memorandum thereof, kept in books to be provided for that purpose, which shall be

open to public inspection." Moreover, by section 10 of the act (*ibid*, p. 521) the justices of the Supreme Court of the United States were empowered to frame general orders for the purpose of regulating the practice and procedure and generally for carrying the provisions of the act into effect. They framed such orders under the head of "General Orders in Bankruptcy" and adopted them on April 12, 1875. [Des. Fed. Pro., p. 337.] Order No. 1, *inter alia,* in defining the duties of clerks, provided that "the clerks shall keep a docket, in which the cases shall be entered and numbered in the order in which they are commenced. . . . The docket shall be so arranged that à brief memorandum of every proceeding in each case shall be entered therein, in a manner convenient for reference. : . . The clerks shall also keep separate minute books for the record of proceedings in bankruptcy, in which shall be entered a minute of all the proceedings in each case, either of the court or of a register of the court, under their respective dates." That rule required not only a "docket," but another and separate book, a "minute book." It is not clear that "Docket No. 5" was the only record of the Warner bankrupt proceedings. Said General Orders in Bankruptcy called for another book and presumably that book was kept. Whether it was lost, mislaid or overlooked when the clerk's deposition was taken, is dark. The files of the Warner Case show that the notice of sale was in fact published in two newspapers. True, only one "proof of publication" was found. But there is satisfactory internal evidence in the report of sale and memoranda of disbursements that a proof of publication in another newspaper was originally attached to the report. The terms of the notice are not criticised. Present the evidence of an actual publication, present the presumption the judge performed his duty, we cannot very well hold that the mere present inability

234 Sup.—4

to find a designation of the newspaper made by him in chambers, one easily lost from the files, shall be taken as substantive proof that no such designation was made. Therefore, the point is ruled against plaintiff.

(c). It is further argued on behalf of plaintiff that if we hold the register had authority to designate a newspaper, and designated two, then the sale was void unless advertised in both. What is said in paragraph *b, supra,* makes it unprofitable to pursue the matter.

(d). This brings us to the only remaining proposition of learned counsel seriously demanding attention, viz.: "The pretended sale of said land by Wm. I. Metcalf was invalid and void, and passed no title, because not approved or confirmed by the court." That proposition is approached, *arguendo,* in their brief in sundry specifications and from divers angles.

We shall not follow the specifications of counsel, but shall deal with the proposition in our own way.

(1). Section 4 of the Act of 1874 amending the Bankrupt Act of 1867 (18 U. S. Stat. at L., pt. 3, p. 178), provides that: "And the *court,* on the application of any party in interest, shall have complete supervisory power over such sales, including the power to set aside the same and to order a resale, so that the property sold shall realize the largest sum." That provision contemplates that the court, not the judge, has power in the premises. The original bankrupt act contained no provision requiring the confirmation of a report of sale either by the judge or by the court. The amendatory act of 1874 contains the quoted provision as its only reference to the matter.

In re Ewing, Jr., Bankrupt, 16 Fed. 753, DRUMMOND, J., in commenting on that provision, says it was passed out of extreme caution to enable the court to prevent the sacrifice of property at a bankrupt sale and that it was nothing more than a declaration of

the power of the court in and about the sale, which power existed independent of that amendment. In the case at bar there is nothing before us showing that any party in interest invoked the power of the court in the premises, as contemplated by the act. So far as appears, the sale was satisfactory to all parties in interest. The naked question before us, then, is this: Is an affirmative order of the court approving the sale necessary in order to validate it and pass title?

The bankrupt records produced here show the report of sale was duly filed. On its very face it was directed to the judge of the court personally and it certifies it was "herewith" handed to him "for confirmation." On its back it is indorsed, "Sale confirmed and deeds ordered." That indorsement is signed by the initial letter "W." Comment is made on the fact that such indorsement is in pencil and that the handwriting was not identified as that of Judge Welker. But on the other hand, every reasonable intendment will be allowed to support so ancient a document found in the files of an old case and in the custody of the proper official. It would hardly do to assume that the indorsement was the wrongful act of a spoliator—some officious outsider or intermeddler having by-ends in mind. For aught here, Judge Welker may have been in the habit of signing and authenticating routine bankruptcy orders and memoranda with his initial and that fact may have been well known to those court officials having to do with those memoranda. We shall assume that Judge Welker confirmed the sale and ordered deeds made.

But such assumption does not close the matter. The trouble is there is nothing to show the confirmation was made by the court. The letter $W$ would indicate the act of the judge as a judge, not the act of the court as a court. Attending to that view of it, as shown by the testimony of the clerk no entry appears on "Docket No. 5" relating to such confirmation.

Chilton v. Metcalf.

But, as pointed out in a former paragraph, the General Orders in Bankruptcy require "minute books" kept as well as "dockets." Presumably, therefore, as· said, such minute book was ·kept. Certainly such presumption would arise, absent testimony one way or the other, as here. If, then, we take the most favorable view to plaintiff, namely, that the sale was a judicial sale and therefore required a confirmation by a court before a deed was made, are we at liberty to also assume on the record presented to us that such confirmation was not made merely because no entry was found in "Docket No 5," which docket, doubtless, was produced from some attic or lumber room or basement vault where it was stored with the court archives pertaining to ancient cases under the defunct bankrupt law? If plaintiff had produced satisfactory evidence that "Docket No. 5" was the only record at the time, or that diligent search had been made by the custodian of those ancient records and no other could be found, we might have a different case to deal with. Plaintiff assumed the laboring oar. He took the burden of showing there was no confirmation by the court. We rule he did not successfully carry that burden and must fail.

(2). We are not a little fortified in that conclusion by the fact that the record shows the assignee made the sale, made report of the sale, handed it to the judge, who placed a favorable indorsement on it, and thereafter the court assumed jurisdiction of the proceeds of the sale, disbursed those proceeds as provided by the bankrupt law, approved the settlements of the assignee showing such receipt of proceeds and such disbursements, and finally adjudicated that the estate was fully and properly administered. There is no escape from the conclusion that the matters enumerated passed under the eye of the court, because the personal assets of the bankrupt seem to have been set off by way of exemptions and the only item of prop-

erty dealt with and administered upon was the Missouri land.

(3). We are further fortified in the conclusion announced because it is the wholesome and settled policy of our law to uphold judicial sales after a great lapse of time, during which files or records may be lost, mislaid or destroyed. [See authorities cited in defendant's brief.]

(4) There is yet another insurmountable obstacle in the way of plaintiff's recovery. Under the old bankrupt act the bankrupt proceeding was a bundle of formidable things, viz., a caveat, an injunction, an attachment and an assignment at one stroke. By operation of law the assignment of the register to the assignee of the bankrupt's property, not exempt, vested title, *ipso facto* and *eo instante,* in the assignee. The bankrupt act did not provide that the title should ever revert to the bankrupt after it had thus passed out of him. But cases may be found announcing the sensible doctrine that if there be surplus property after executing the trust and paying all debts, such surplus on the discharge of the assignee reverts to the bankrupt without reconveyance or re-assignment. So, cases may be found where no debts were proved up, or where some composition was made, or where the assignee had nothing to do or perform in the way of executing his trust, where at the end of the proceeding the title reverted to the bankrupt by operation of law. So, cases may be found where an assignee exercised his right to abandon a certain piece of property because of some compromise adjustment or because burdened by incumbrances or contractual obligations making it an unprofitable asset, or where the assignee elected not to accept the title to property deemed worthless, where title by operation of law reverted to the bankrupt. So, cases may be found where after the discharge of an assignee and without any new proceeding in bankruptcy another assignee was appointed who under-

took to convey property not sold by the first assignee, where title has been held to revert to the bankrupt. Samples of cases dealing with the foregoing several phases of the matter are Burton v. Perry, 146 Ill. l. c. 111, *et seq.;* Sessions v. Romadka, 145 U. S. 29; King v. Remington, 36 Minn. l. c. 30, *et seq.,* and cases there reviewed; Peery v. Carnes, 86 Mo. 652.

Plaintiff relies on cases of that character. But none of them are in point. In the instant case the title was accepted by the assignee. The land was not a worthless asset which he elected to reject or abandon. It was not an asset held *cum onere*—one tangled and complicated by mortgages or other burdens or disputed claims. It was clear and unincumbered. It was the *only* asset. He dealt with it, sold it, appropriated the proceeds to the costs and expenses of his trust and to the payment of a percentage dividend on allowed debts of Warner. There was no surplus. Nay, there was no possibility of a surplus, for Warner was hopelessly insolvent with no means of escape from his debts by payment in full. In such condition of things this bankrupt, after consenting by acquiescence in the appropriation of his property to his creditors, and without any timely complaint from him or anyone else in interest, twenty-eight years after the sale and because of its alleged lack of confirmation by the court, conveys to plaintiff, who, in turn, seeks to recover the land. He brings no bill to redeem from a defective sale. Although in a court of equity, he makes no offer to do equity by tendering the purchase price which went to pay the bankrupt's debts. Indeed Warner was discharged of those debts by virtue of the very fact that he surrendered to his creditors the very land in question. He took and kept his discharge and now, speaking through his grantee (who took with notice), he wants the land. In such condition of things there are no equities in favor of plaintiff. He stands on a dry technical legal title or none at all. As to that legal

title, it passed out of his grantor to the assignee in bankruptcy. So much is certain. It then either passed from the assignee to the purchaser at the assignee's sale, or else (by reason of some irregularity in that sale) an equitable title passed superior to the legal title and with which the chancellor was confronted at the trial. Before the chancellor could have decreed title in plaintiff he had to find plaintiff's title was a better legal or equitable title than Metcalf's. [Gage v. Cantwell, 191 Mo. 698; Harrison Machine Works v. Bowers, 200 Mo. l. c. 236.]

We are cited to no case warranting recovery under the facts we are dealing with. There are cases *contra*—e. g., Scruby v. Norman, 91 Mo. App. 517, and cases cited.

In our opinion the chancellor solved his problem correctly when he found for defendant Metcalf. The judgment is affirmed. All concur, except *Valliant, J.*, absent.