## FIDELITY & CASUALTY CO. OF NEW YORK v. BRIGHTMAN et al.

### No. 9044.

Circuit Court of Appeals, Eighth Circuit.

Sept. 25, 1931.

Rehearing Denied Nov. 7, 1931.

E. H. McVey, of Kansas City, Mo. (Samuel R. Freet and Lester G. Seacat, both of Kansas City, Mo., on the brief), for appellant.

Ed S. Jones, of Macon, Mo. (George N. Davis and Otho F. Matthews, both of Macon, Mo., on the brief), for appellees.

Before KENYON and BOOTH, Circuit Judges, and OTIS, District Judge.

KENYON, Circuit Judge.

This suit was brought by appellant to enjoin the prosecution of some sixty-one separate actions pending in the state courts of Missouri. Plaintiffs in these suits sought, as depositors of the defunct Citizens' Bank of Lancaster, Mo., to recover against Frank C. Millspaugh, Commissioner of Finance of said state, and appellant, as surety on his bond, amounts aggregating some $50,000. The equity jurisdiction rests on the claim that the amounts sued for, if allowed, would largely exceed the penalty of the bond, that appellant would be seriously prejudiced by the multiplicity of suits, and that no adequate remedy at law exists. Appellees (plaintiffs in the state courts) appeared and filed "answer and interplea" asking judgment against appellant and the establishment of their respective claims against the fund (appellant having offered to pay the amount of penalty of the bond; viz., $25,000, into court), and further asking the court to inquire into the matter, and to render an account between them and appellant and any other persons who might be entitled to participate in the disposition of said fund.

The matter was referred to a special master, who was authorized to take the testi-

mony and report findings of fact and conclusions of law to the court. The master, after hearings, filed his report sustaining appellees' claims to the extent of $13,731.87. Exceptions to the report were overruled by the court, and judgment was entered for appellees for $13,731.87. The decree provided that said sum be equitably and rateably divided and paid to appellees.

The issue here is the liability of Millspaugh, as Commissioner of Finance, to the depositors of the defunct state bank. Appellant's liability depends on Millspaugh's, which in turn depends in part on the construction of certain statutes of Missouri in their relationship to the facts.

The facts are these:

Millspaugh, as Commissioner of Finance of the state of Missouri, had under his supervision some 1,590 state banks, of which the Citizens' Bank of Lancaster was one.

A. J. Stanfield was deputy commissioner in charge of examiners.

Alfred C. Martin was one of the examiners in Millspaugh's department.

Both Stanfield and Martin gave bonds to the state of Missouri for the faithful performance of their duties. The Department of Finance had charge of banks, trust companies, and general supervision of the banking business of the state. It combined several pre-existing departments, and the Commissioner of Finance took the place of the bank commissioner theretofore existing. His authority and duties were very extended and important.

In February, 1923, Martin made an examination of the Lancaster bank. Its condition was unsatisfactory. His examination which was commenced February 3, 1923, showed an impairment of the capital stock to the extent of $9,634.47, caused by carrying real estate in the name of the cashier for the benefit of the bank. He found a shortage of $4,000 of the assistant cashier, also a number of slow and doubtful notes. He went to Kirksville some miles away, and called Deputy Commissioner Stanfield on the telephone and told him the exact situation. He did not tell him the bank should be closed. Stanfield advised him that if he had a form of a bond, which it was the custom of the department to accept in order to make a bank more secure, to take it, and instructed him to either close the bank or take the bond. Martin went back to Lancaster, and had an all night meeting with the board of directors. He went over the assets and put the directors

under oath, made memorandums of the various items considered doubtful, investigated the solvency of the collateral back of the loans, and, at the conclusion of his examination, took a bond signed by all the directors representing assets of $227,000, to pay all obligations of said bank. These same directors owed the bank some $52,000. He concluded his examination on February 7th, and forwarded his report and the bond to the office of the Commissioner of Finance. The part of his report which was concluded on February 7th, showed that the impairment of capital stock had been rectified, and it contained the following statements:

"You will notice that we reduced
the cash items................$ 6,284.83
Took up shortage............... 13,990.52
and by acquiring other real estate
took up doubtful notes....... 9,979.11

"Also notice that we kept the reserve up and reduced the bills payable $5M.

"We have up for guarantee a deed from Cashier & wife held in escrow for any losses which may occur, this deed covers town property and a tract of land worth $10M clear and unincumbered.

"Attached to this report you will find an agreement signed by all the directors with sworn financial statements also attached."

After Martin sent his report to the Department of Finance, Stanfield dictated a letter to A. D. Morris, president of the Lancaster bank, which was placed before Millspaugh on March 9, 1923, and was signed by him calling the bank's attention to the matters found by Martin, and pointing out specifically what should be done to remedy the situation. Parts of said letter, important here, are as follows:

"The management of your Bank has been neither prudent, capable or successful, and it is believed by this Department that the management will have to be changed to become successful. * * * You have past due loans aggregating more than $43,100.00. Many of these notes are reported to be bad and doubtful. This is certainly an excessive amount of past due paper for a Bank with your volume of business, and should have attention until collected, renewed with ample security or charged from your assets.

"The following loans are considered worthless: Jack Whiteacre, $850.00, Geo. F. Warriner, $10.00 and Wm. F. Shepherd, $708.98. They should be charged from your assets without delay. * * * The total

of these slow and doubtful loans is more than $21,900.00, and it goes without saying that it will be necessary for your officers and directors to give prompt attention to this feature of your business until it can be placed in a more satisfactory · condition. * * * At the date of the examination, forty accounts were found overdrawn, and in addition to this, a large amount of irregular items appeared in your Cash Account.

"Last August you paid a $2,000.00 dividend. No further dividend should be paid until your Bank is placed in a more satisfactory condition.

"You pay five per cent interest on Time Certificates. This is considered to be an excessive and unprofitable rate of interest, and should be discontinued. * * * The Examiner informs me that during the examination certain discrepancies and irregularities were found but were corrected. I also find a copy of a bond signed by all the directors, guaranteeing all the liabilities. Please be informed that this bond can only be considered a temporary measure, and from the statement, it is believed by this Department that it will be difficult for you to have success, owing to your large capital, large Bills Payable and small Deposits, coupled with such a large amount of slow and doubtful and unsatisfactory assets. It is the opinion of this Department that an entirely new capital should be paid in, or arrangements should be made to have some other Bank take over your business.

"Please bring this letter before your Board, and report to me over the signatures of all the directors within fifteen days, what action is taken and what contemplated concerning each item mentioned herein."

The directors replied to this letter admitting the criticisms were just, but stating that, since Martin's examination, every effort had been put forth to get things in proper condition; that the shortage of the assistant cashier had been made good, and that he had retired from the bank; that past-due loans would be paid at once or renewed with surety; and that equities were being secured on the doubtful paper, and concluded with this sentence: "We think that in a reasonably short time, we can have things in much better condition and hope to the satisfaction of your department."

This letter was signed by all the directors. The Lancaster bank was taken over September 23, 1923, utterly insolvent.

We set forth findings 11 and 12 of the special master, as follows:

"11. I find that the Citizens' Bank of Lancaster was, on February 7th, 1923, insolvent, and that its continuance in business would jeopardize the interest of the depositors and other creditors, which was known to Commissioner Millspaugh, or by the exercise of ordinary care, should have been known to him; that Commissioner Millspaugh was unfaithful in the discharge of his official duties in allowing this bank to continue in business after March 9th, 1923, when he became advised of its condition.

"12. That neither Commissioner Frank C. Millspaugh, Deputy Commissioner A. J. Stanfield, nor Bank Examiner Alfred C. Martin were guilty of any corruption or malice, or actual fraud, in relation to the examination, supervision and regulation of the affairs of the Citizens' Bank of Lancaster, Missouri."

Also these conclusions of law:

"First: That Commissioner Millspaugh had the right and power, to close the Citizens' Bank of Lancaster on information coming to him from any source; that this authority was not affected by the recommendation of a Bank Examiner or the failure of the Examiner to recommend that the bank be closed, on submission of, or in connection with, a report made by the Examiner, touching the affairs of said bank. * * *

"Third: The law gave to the Commissioner alone the power to close a bank. This power being lodged with the Commissioner and having delegated to Deputy Stanfield the power and authority to close a bank, the acts and conduct and knowledge of the Deputy became the acts, conduct and knowledge of the Commissioner. The acts and conduct of Deputy Stanfield not having been repudiated by Commissioner Millspaugh, the law will presume that Deputy Stanfield acted within the scope of his authority and instruction.

"Fourth: The law gave to the Commissioner power and authority to close a bank, if it was insolvent, or if its continuance in business would seriously jeopardize the safety of the depositors and other creditors. When Deputy Stanfield ordered Examiner Martin to close the Citizens' Bank at Lancaster, on February 6th, 1923, unless satisfactory bond was given, the law will presume that Deputy Stanfield found, on the information obtained from Examiner Martin, and

from his knowledge of the condition of said bank, as shown by the records of his office, either one or both of the conditions that must exist in order to close a bank did exist, so that the only question really involved in this controversy is:

"Did the Commissioner of Finance have power and authority, under the law, to take a bond from the directors covering all liabilities. except capital and surplus, and allow the bank to continue to operate, notwithstanding it was insolvent, or such continuance in business would seriously jeopardize the interests of the depositors and other creditors?"

All the findings and conclusions were approved by the court.

This case is an attempt to hold a public officer liable on a bond given to the state of Missouri, the condition of the same being that he "will faithfully and impartially discharge all duties of his office."

It is the theory of appellees that this bond was breached by the failure of Millspaugh as Commissioner of Finance to close the bank on March 9, 1923, as he must have then known that it was insolvent or that its continuance in business would seriously jeopardize the safety of depositors. That he, acting through his deputy, Stanfield, had found the bank to be in an insolvent condition.

The theory of appellant is that Commissioner Millspaugh was not liable for loss to depositors resulting from failure to close the bank, as this involved the exercise of discretionary power, unless in exercising such discretion he was actuated by a spirit of willfulness, corruption, or malice.

We do not understand it to be seriously urged that any of these officials acted in a spirit of malice or corruption. The special master found they did not. The contention is that the commissioner neglected to perform a ministerial duty; viz., close the bank knowing it to be insolvent, and that if he did not know it to be insolvent he abused his discretion in ignoring certain facts which would have demonstrated insolvency.

The Missouri rule is in line with the general run of authority that a public officer charged with discretionary duties is not liable for a mistake of judgment or an erroneous performance of said duties unless he be guilty of willful wrong in relation thereto, but that as to ministerial duties he is liable for the violation or neglect thereof to the party injured thereby and that a mistake of judgment does not excuse him. In Cook v. Hecht, 64 Mo. App. 273, speaking of the discretionary duties of public officers, the court said: "They are not liable so long as they honestly and in good faith perform the work intrusted to them."

In Schooler v. Arrington, 106 Mo. App. 607, 81 S. W. 468, 469, it is said: "It is well settled in this state that, when a public officer is charged with duties which call for an exercise of his judgment and discretion, he is not liable for an erroneous performance, unless he has been guilty of willful wrong, malice, or corruption."

The court there held that the mere charge of negligence and carelessness was not sufficient. See, also, Sharp v. Kurth et al. (Mo. App.) 245 S. W. 636; Smith v. Berryman et al., 272 Mo. 365, 199 S. W. 165, 1 A. L. R. 1692; State v. Diemer, 255 Mo. 336, 164 S. W. 517. In Kendall v. Stokes, 3 How. 87, 98, 11 L. Ed. 506, it was said by Chief Justice Taney: "But a public officer is not liable to an action if he falls into error in a case where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion; even although an individual may suffer by his mistake. A contrary principle would indeed be pregnant with the greatest mischiefs."

State v. Turner (Mo. App.) 17 S.W.(2d) 986, is an important Missouri case dealing with the liability of a bank examiner for alleged negligence in failing to learn of the insolvency of a bank. It should be said that the opinion in this case was withdrawn by the Supreme Court of Missouri subsequent to the submission of this case in this court and a new opinion substituted, 42 S.W.(2d) 594, which is not as yet reported [in State report], but we have been furnished with copy of the same by counsel for appellees. The new opinion does not go to the same extent as the old one, but holds that an examiner is not liable for an error of judgment in determining the solvency of a bank. The court boils the case down to the one proposition of whether Turner was negligent in not making a reasonably careful examination of the bank, thereby failing to discover a very large embezzlement that would have shown the bank to be insolvent. It holds that the duty to make an examination once a year under section 11689, Rev. St. Mo. 1919, was a ministerial duty, but that the kind of examination and the length of time used in making the same is discretionary and seems to indorse the view of the court in State v. Title Guaranty & Surety Co., 27 Idaho, 752, 152 P. 189, 192; and in Deatsch v. Fairfield, 27

Ariz. 387, 233 P. 887, 893, 38 A. L. R. 651, that the question of determining whether a bank is insolvent is a discretionary duty and that when the commissioner charged with supervision of banks has determined a bank to be insolvent the duty becomes ministerial to close the same at once. It held there was no evidence to show Turner negligent, and that therefore he was not responsible.

■ It is well-settled law that public officers are not responsible for acts of subordinate officials, if such subordinates are themselves employees of the government, where there is no negligence on the part of such public officials in employing them, unless the superior officer has directed or encouraged or ratified such acts, or has personally co-operated therein. Michel v. Smith, 188 Cal. 199, 205 P. 113; Dowler v. Johnson, 225 N. Y. 39, 121 N. E. 487, 3 A. L. R. 146; Barker v. C., P. & St. L. R. Co., 243 Ill. 482, 90 N. E. 1057, 26 L. R. A. (N. S.) 1058, 134 Am. St. Rep. 382; Colby v. City of Portland, 85 Or. 359, 166 P. 537; City of Duluth v. Ross, 140 Minn. 161, 167 N. W. 485.

■ The Missouri courts recognize the general presumption that until the contrary is shown every public officer lawfully performs his duties. Chilton v. Metcalf et al., 234 Mo. 27, 136 S. W. 701; General Rule 22 R. C. L. § 143.

It is necessary to refer to some of the provisions of the Revised Statutes of Missouri of 1919. They establish the Department of Finance heretofore referred to under control of the Commissioner of Finance, and provide for the appointment of a deputy commissioner and examiners by the commissioner with the approval of the Governor. All employees of the Department of Finance are to perform such duties as shall be required of them by the Commissioner of Finance.

Part of section 11680 is as follows: "In case such bank commissioner, deputy or examiner shall wrongfully report any such bank, private banker, savings and safe deposit company or trust company in an insolvent condition, or in case he shall report any such bank, private banker, savings and safe deposit company or trust company to be solvent, knowing the same to be otherwise, and any person be injured thereby, such person shall have a right of action on the official bond of such bank commissioner, deputy or examiner for his injuries or damages sustained. Such action shall be brought in the name of the state at the relation of the injured party."

Section 11689 provides for a yearly examination and other examinations, if necessary.

Paragraphs 1 and 2 of section 11698 are:

"Orders of commissioner.—(1) Whenever the bank commissioner shall have reason to believe that the capital stock of any corporation or private banker subject to the provisions of this chapter is reduced by impairment or otherwise, below the amount required by law, or by its certificates or articles of association, he shall issue an order that such corporation or private banker make good the deficiency forthwith or within a time specified in such order.

"(2) Whenever it shall appear to the commissioner, from any examination made by him or his examiners, that any corporation or private banker subject to the provisions of this chapter, or any foreign corporation licensed by the commissioner to do business under this chapter, has violated its charter or any law, or is conducting its business in an unsafe or unauthorized manner, the commissioner shall, by an order, direct the discontinuance of such illegal and unsafe or unauthorized practices, and strict conformity with the requirements of the law, and that it proceed with safety and security in its transactions, and he may order the delinquent to appear before him, at a time and place fixed in said order, to present any explanation in defense of the practices directed in said order to be discontinued."

■ Section 11700, in part, provides: "The bank commissioner may forthwith take possession of the business and property of any corporation or private banker, subject to the provisions of this chapter: * * * (2) Whenever from an examination made by the commissioner, or by one of his deputies or examiners, it shall be discovered that any such corporation or private banker is insolvent, or that its or his continuance in business will seriously jeopardize the safety of its or his depositors or other indebtedness, and if the action is taken from an examination by an examiner and such examiner shall recommend the closing of the corporation or private banker, then it shall be the duty of the bank commissioner, if he approve such recommendation, by himself or one of his examiners, immediately to close said corporation or private bank, and take charge of all the property and effects thereof."

This section provides that the bank commissioner may take possession of a bank, etc., under the conditions stated therein. The word "may," as here used, should be considered as if it were "shall" or "must." The authorities so holding are numerous. In Rock Island County v. United States ex rel., 4 Wall. 435, 446, 18 L. Ed. 419, it is said: "Where power is given to public officers, in the language of the act before us, or in equivalent language—whenever the public interest or individual rights called for its exercise—the language used, though permissive in form, is in fact peremptory."

See Lapsley v. Merchants' Bank, 105 Mo. App. 98, 78 S. W. 1095; State v. Title Guaranty & Surety Co., 27 Idaho, 752, 152 P. 189; State v. American Surety Co., 26 Idaho, 652, 145 P. 1097, Ann. Cas. 1916E, 209; State v. Kent, 4 N. D. 577, 62 N. W. 631, 27 L. R. A. 686.

What duty under these sections and the general law did Millspaugh fail to perform? Section 11680 is the only one distinctly creating a cause of action. Under that, if the commissioner wrongfully reports a bank to be solvent when it is insolvent, or reports it insolvent when it is not, the injured party is given a right of action on the official bond of the commissioner. The statute does not specify as to whom the report referred to should be made. There is nothing here to show that the commissioner reported this bank as insolvent. In fact, no report as to the solvency of the Lancaster bank was made by Millspaugh, Stanfield, or Martin. It is clear that this case does not fall within section 11680.

As an examination of the bank was made for the year in question, there was no breach of section 11689.

Section 11698 refers to impairment of capital stock, and conducting business in an unsafe manner. When Martin commenced his examination, the capital stock was impaired, but that was fully remedied by the time he had completed the same. Sections 11698 and 11700 do not provide a specific right of action as does section 11680, and liability thereunder must be determined by the common-law principles of liability of public officers, which we have previously discussed. Under section 11700, the action of the commissioner in determining whether or not the bank was insolvent, or whether its continuance in business would seriously jeopardize the safety of depositors, was discretionary. If he reached an honest conclusion, in exercising his discretion, that either of said conditions existed, then discretion ended and a ministerial duty arose to close the bank immediately, and take charge of the same. In State v. Title Guaranty & Surety Co., 27 Idaho, 752, 152 P. 189, 192, the court was dealing with an act similar to section 11700 of the Missouri statutes except that the Idaho act had, in addition to what that section provides, this clause, "or whenever such commissioner has reasonable cause to consider such bank insolvent." It said: "The law invests the bank commissioner with discretion while he is making his investigation and up to the point where he reaches the conclusion and becomes satisfied that the bank has unlawfully refused to pay its depositors or has become insolvent, but at this point his discretion ends, and it becomes his mandatory duty to close it, a duty the failure to perform which renders him and the surety upon his official bond liable to depositors who lose their money as a direct result thereof."

In Deatsch v. Fairfield, 27 Ariz. 387, 233 P. 887, 893), 38 A. L. R. 651, the court said: "It is not required that the comptroller's judgment, as to whether a bank is insolvent, be infallible. His action as judged by the beliefs and standards prevalent at the time doubtless was what the ordinarily prudent and cautious person would have done under the same conditions and circumstances. * * * If the known certain value of the bank's assets at the time of the trial be taken as the criterion, then it was unquestionably insolvent when it was turned back to its officers in April, 1921. But if the problematical value of such assets as seen by those concerned, the stockholders, officers, depositors, and the comptroller, be adopted as the criterion, and the universal rule of judging their action by what the ordinarily prudent person would have done in similar circumstances be the yardstick applied, a different conclusion will be reached. * * * The comptroller, in passing upon the question as to whether a bank is solvent or not, exercises judgment and discretion, and it is not until he has determined the bank to be insolvent that he acts ministerially and becomes liable on his bond for dereliction of duty. * * * Officers who honestly and in good faith examine a bank's assets and arrive at the conclusion that it is not insolvent and permit it to continue to transact business, are not liable on their official bonds if it later develops that such institution was in fact insolvent."

The Missouri rule as to what constitutes insolvency is stated in White v. Poole, 220 Mo. App. 973, 272 S. W. 1021, 1025 as follows: "Insolvency, as applied to banks, is defined as 'inability to pay its debts in the usual and ordinary course of business.'"

Second Morse on Banks and Banking, page 1035, defines it as being unable to meet obligations as they mature in usual course of business. It might be a mandatory duty of the Commissioner of Finance to settle the question of insolvency or danger to depositors, but how the question should be determined is a matter of judgment and discretion. A mere erroneous conclusion uninfluenced by malice or corruption cannot be the basis of an action for damages. In Sanders State Bank v. Hawkins et al. (Tex. Civ. App.) 142 S. W. 84, 88, a bank commissioner was sued for damages arising out of an alleged wrongful act in closing a bank, under a provision of the Texas statutes almost identical with section 11700 of the Missouri statutes. The court said: "The solvency of a bank whose only resources are its capital stock, a large portion or all of which has been loaned to private parties, and the remainder invested in other property, and the propriety of its further continuance in business, in view of the methods pursued by its officers, may be questions about which different minds might reach different conclusions. When an emergency arises in which the determination of those questions becomes essential to the performance of a public duty, they must of necessity be referred to some official or tribunal whose judgment shall be decisive. * * * Clearly, if he had the right to determine the propriety of closing the doors, he also had the power to carry his judgment into effect. It would be useless to clothe an officer with powers to judicially determine a question, and provide no means for enforcing his judgment. If he closed the bank at a time when it was not insolvent, and when its business was in all things being properly conducted, his action would be simply erroneous, and not in excess of his actual authority."

 It is urged by appellees that insolvency is shown by Martin's report to the Department of Finance, by Stanfield's statement to Martin to close the bank or take a bond, by the taking of the bond, and by Millspaugh's letter of March 9, 1923, to the bank officials. Undoubtedly Martin's report to the Department of Finance showed the bank to be in an unsatisfactory condition. It was in a better condition, however, when he completed his report on February 7th, than when

he commenced his examination on February 3d. Undoubtedly this bank was in a most unhealthy financial condition, but can a court say that Millspaugh, in view of Martin's report including the examination which he' made of the directors under oath, and returned as a part of said report, abused his discretion in not finding the bank insolvent or in such dangerous condition that it should be closed? The capital was intact when Martin finished his report. There was a surplus of $6,000, and there was considerable improvement in the bank's condition. Looking back on this transaction, it is apparent in the light of conditions subsequently developed that it would have been better if the bank had been closed after the examination. However, neither Martin nor Stanfield thought so, and the situation came before Millspaugh on March 9, 1923, when the letter Stanfield had prepared was placed before him for signature. Appellees urge that this letter is sufficient to show that Millspaugh must have known when he signed the same that the bank was insolvent. The master found that Martin's report did not necessarily show on its face that the bank was insolvent. Some expert bankers testified before the master that this report showed the bank was insolvent, and others testified that it showed solvency, evidencing the diversity of views as to what constituted insolvency. As far as the record shows, Millspaugh knew nothing of the conversation over the telephone between Stanfield and Martin. His first complete knowledge of the affair was the letter placed before him by Stanfield. He was called on to deal with a sick bank and was desirous of saving it. He was confronted with the duty of determining whether, under the facts placed before him, it was insolvent or its further continuance would seriously jeopardize depositors and should be closed under section 11700, or whether it should be permitted to continue under certain conditions. The plan of Martin and Stanfield to take a bond signed by the directors as further security was ratified by Millspaugh. We agree with the first conclusion of law of the special master that the commissioner had a right to close the bank on information coming to him from any source, regardless of whether or not there was a recommendation of a bank examiner. Appellees insist that while the Commissioner of Finance would not be responsible for an honest mistake of judgment in passing upon the question as to whether the report of the examiner with the bond attached showed the bank to be solvent or insolvent, that for the commissioner to arbitrarily pass on the mat-

ter contrary to the facts was an abuse of discretion. The trial court in the present case in its memorandum opinion on exceptions to the report of the special master said that the testimony was overwhelming to the effect that the bank was insolvent at the time of the examination, and that such insolvency was apparent at the time the commissioner sent the letter to the officers of the bank hereinbefore referred to. We are unable to agree with this statement as we think it a question of fair dispute whether the facts developed by the examination of Martin showed the bank to be then insolvent. It is not for us to determine whether the state officials exercised poor judgment or to substitute our judgment for theirs. There is no claim of fraud, malice, or corruption in their action. It was apparent to Millspaugh that the bank needed attention, that its officers were negligent, and it was a part of his duty to determine whether it should be closed or whether he should proceed under section 11698, and notify the bank officials to change their methods and remedy the irregularities. The statutes we have quoted recognize a difference between a finding that a bank was carrying on its business in an unsafe manner, remedy for which situation was under section 11698 and a finding that the bank was insolvent or in a condition to seriously jeopardize the depositors, the remedy for which would be under section 11700. The commissioner had a choice of two remedies to use in assisting this institution. It might have been doubtful which remedy would best restore the patient to business health. This demanded the exercise of the honest judgment and discretion of the commissioner. He decided the best remedy to be that provided by section 11698 and in doing so he exercised a discretion reposed in him by the laws of the state.

These officers had no motive but to save the bank. That is unquestioned. The closing of a bank in a small community is a sad tragedy. It leaves a trail of suffering, blighted hopes, and angry resentments. Savings of lifetimes are swept away, and optimistic hopes for the future are destroyed. It is something to be avoided if possible. It is equally important, however, that officers charged with the duty of protecting depositors shall be faithful in the performance of their duties. Situations are necessarily presented of great difficulty, and mistakes will occur, more easily apparent in retrospection than at the time of action.

The point where the discretionary duties of Millspaugh would end and ministerial duties commence was, in our judgment, never reached, unless the claim is sound that Stanfield, within the discretion confided to him by Millspaugh, in carrying out Millspaugh's duties determined the bank to be insolvent, or in condition to seriously jeopardize the safety of its depositors when he instructed Martin to close it or take a bond. This brings us to the much-mooted question of the bond. We may say here that in our opinion the acts of Stanfield as deputy commissioner in co-operating with Millspaugh in doing Millspaugh's work under his direction were acts for which Millspaugh could not avoid responsibility by delegation of authority to Stanfield. City of Duluth v. Ross, 140 Minn. 161, 167 N. W. 485. The burden of work was such that Millspaugh could not carry the entire load, and Stanfield acted for him at his direction and under his control with relation to this bank, although the actual order for the closing of the bank would have to come from Millspaugh.

Does taking the bond as an alternative to closing the bank amount to a determination that the bank was insolvent or unsafe for depositors? Stanfield did not assume to decide whether the bank should be closed, but placed the matter before Millspaugh. If Millspaugh, Stanfield, and Martin's act in taking the bond had tided the bank over to better times, it would have been hailed as a fine business achievement. We refer to some of the testimony as to the situation presented to them for attention.

Stanfield testified: "As I recall, Mr. Martin called me on the telephone in regard to the matter and told me in a general way what he had, and that he could get this bond.

"Q. What instructions, if any, did you give him? A. I told him to take the bond if the security was adequate. * * *

"My feeling with regard to the matter is simply that Mr. Martin made the examination. The records of the Department show that the bank had not been in a satisfactory condition, and, as a result of Mr. Martin's examination, we requested them to put up the shortage. The Assistant Cashier was retired. Mr. Martin took a bond which the statements showed would be worth more than $220,000.00, and we thought that the bank was in better condition than it had been before, because of those things. * * *

"Q. Will you take the report Exhibit A-1, which I understand you have examined, and state whether or not that report shows that the bank was solvent or insolvent. A. In

my opinion, the report shows the bank to be solvent. * * *

"The loans to the officers and directors in view of the financial statements attached to Exhibit A-1 were not excessive under ordinary banking rules, and there is nothing in those statements to create suspicion that the values were inflated, nor is there anything in the report to create the suspicion that the value was inflated."

Martin testified:

"Q. Do you recall whether any other loans were considered worthless by any of the directors? A. No, they were not.

"Q. What was said about the loans shown in Class 2, marked 'slow and doubtful'? A. They were each one gone over with the directors, and no obligations made by the directors as to the classification under Class 2. And there were no other loans outside of those listed in Class 2 that any of the directors stated might be slow and doubtful.

"The loans in Class 3, 'loans to officers,' total $52,419.13, were gone over item by item. I considered them all good. They gave me financial statements showing that they were. * * * At the conclusion of this examination, I took a bond from the directors. That came about in a conversation with Mr. Stanfield before going into the meeting. I told them what Mr. Stanfield said; that if they would put up a bond, the bank would be permitted to operate.

"Q. Did you give them any alternative, if so, what? A. I told them they would either have to do this or we would have to take it over in the morning. * * * I called Mr. Stanfield, the Deputy Commissioner, from Kirksville, and reported to him the things I had found, and which I have just detailed. I did not tell him I was going to close the bank. He instructed me to either close the bank or take the bond. As to whether he laid these matters before Mr. Millspaugh I have no knowledge. I received a copy of the letter of March 7th written by Mr. Millspaugh, but did not have that when I was in Lancaster on March 20th. * * *

"Q. Was the capital of the bank impaired at that time as shown by the report? A. Before the adjustment was made it was, yes, sir. I refer to the shortage on bills payable account of the Assistant Cashier. After that was adjusted, there was no impairment of the capital stock.

"Q. Was the bank insolvent on the basis of what you found there as shown by this report? A. No, sir."

We are unable to agree with the conclusion of the master that because of the taking of the bond a presumption arises that Stanfield found the bank to be in a condition requiring it to be closed under section 11700. It was customary in the banking department to take such bond. Martin testified that he was furnished with this form of bond, and instructed when he was inducted into office under a previous commissioner to use it in cases where they were not fully satisfied as to the condition of the bank and where there was past-due and doubtful paper. He testified "I only took the bond as a precaution for other things that might show up." Stanfield testified that this form of bond was furnished to examiners to be used "at such times and places as it was impossible for them to determine the actual value of the securities held by the bank, when there was any question, or where it took time to determine."

Millspaugh testified that there was a form of bond in use in the department to be taken by the examiner from directors of banks under certain conditions, "if in his judgment it was the best thing for him to do and to allow the bank to remain open if the interests of the depositors were not thereby jeopardized." He further said: That taking of the bond was an "excellent method of making debtors feel their responsibility."

Former Commissioner Hughes testified that during his administration bonds were taken when it was felt that the condition of a bank could be remedied.

It is urged that the bond added nothing to the assets of the bank. We are satisfied it did. It was additional security, and not in lieu of assets. The directors were responsible in continuing to take deposits if they knew the bank was in failing circumstances. Utley v. Hill, 155 Mo. 232, 55 S. W. 1091, 49 L. R. A. 323, 78 Am. St. Rep. 569. The directors at the time of giving the bond were certainly not liable for fraud in accepting deposits with knowledge of failing circumstances of the bank. They seem to have optimism enough as to the bank to pledge personal assets of $227,000, to carry it on which naturally they would not have done if they thought it to be in failing circumstances. In Harriet State Bank v. Samels, 164 Minn. 265, 204 N. W. 938, 940, the court said: "It is urged that, since the superintendent of banks is a statutory officer, he has no authority save that expressly conferred upon him by law; that he is powerless to agree to refrain from the performance of an official duty; that he should have closed

the doors of the bank when its capital became impaired; and that it was contrary to public policy to permit the bank, threatened with insolvency as it was, to continue to receive deposits. * * * The Legislature has not prescribed the manner in which the superintendent shall exercise control. It is his duty to exercise his powers so as to safeguard the rights of those who deal with banks in reliance upon their stability and solvency. The Legislature has conferred upon him the general power of control, leaving it to him to determine in what manner the power may best be exercised. If he can save a bank from liquidation and protect the depositors from loss by compelling a change of management, or the replacement of assets of doubtful value with those which are sound, or if he can obtain security for the payment of obligations due to the bank and so transform bad paper into good, no one should be heard to complain. It is sound public policy to permit him to adopt any lawful method by which the failure of a bank may be averted. Although the statute does not expressly authorize him to take security for the payment of notes due to a bank of impaired capital, authority may be inferred from the language of the statute."

In State ex rel. Funk v. Turner (Mo. App.) 17 S.W.(2d) 986, 991, first opinion, the court said: "In the absence of willful violation of the banking act, we think the bank commissioner has discretionary authority to take such steps to meet a particular situation as the circumstances may require." Suppose the directors here had put up cash instead of a bond to make more secure the situation, would the closing of the bank still be mandatory? We think not. The bond represented contractual liability of $227,000, even if the directors owed the bank some $52,-000. While there is no provision of the Missouri statutes for taking such bond, there is no inhibition against it. The threat of Stanfield to close the bank if a bond was not given was not a determination of the fact that it was insolvent. The alternative presented shows that he had not fully determined it was insolvent or in a dangerous condition for depositors under section 11700. If Stanfield had not fully made up his mind, certainly Millspaugh was not bound by an expression he used to Martin concerning a situation that was somewhat remedied prior to Martin's report. We do not think the taking of this bond ratified by Millspaugh can in reason be deemed conclusive evidence of a determination that the bank was insolvent or in a condition to seriously jeopardize the safety of depositors, a determination which both Stanfield and Martin testified they did not make. It is evident that they were not willing the bank should continue on the conditions first found, but, after applying certain remedies, they felt the procedure under section 11698 was the proper one, and the same was embodied in the letter prepared by Stanfield for Millspaugh to sign. Whether or not Stanfield had power to close the bank, the fact is that no one determined before September, 1923, that the bank should be closed or made any report to that effect. We see no failure of ministerial duty on the part of Millspaugh, Stanfield, or Martin, for the matter never reached the point where there was a clear duty to close the bank, and surely there is no such abuse of discretion shown as to amount to bad faith. That they erred in judgment in exercising their discretionary duties, now is apparent. That is not sufficient however under the Missouri statutes or the general law as a basis for recovery by depositors.

Error is assigned in admitting certain pleadings in the circuit court of Schuyler county which it is claimed amounted to admissions by Millspaugh of insolvency of the bank when the bond was taken. These were not signed by Millspaugh. There was no proof that he knew their contents. They were prepared after the failure of the bank when there was no doubt of its insolvency, and there is nothing therein contained to prove knowledge on his part of insolvency as of the time of the February examination. In Fidelity & Deposit Co. v. Redfield (C. C. A.) 7 F.(2d) 800, 803, the court said that such evidence was properly excluded "for the reason that the answer and counterclaim were not signed or sworn to by the defendant in error, and the admissions contained therein were not made by him." We think the pleadings were not admissible, but our reversal of the judgment is not based on that ground. There was no particular prejudice resulted from such admission.

We are unable to agree with certain conclusions of law found by the master and approved by the court. Nor do we think some of the findings of fact of the master are sustained by the evidence. There is considerable inconsistency in holding that Millspaugh acted as a faithless public official and was guilty of knowingly permitting an insolvent bank to remain open and depositors to be defrauded, which, under former Missouri statutes, would have made him guilty of a criminal offense and a finding that nei-

ther he, Stanfield, nor Martin were guilty of any corruption, malice, or fraud in relation to the examination, supervision, and regulation of this bank. We do not think, viewing the entire matter as of the time when the report was made and Millspaugh acted, it can be said that because he did not close the bank he did not "faithfully and impartially discharge all duties of his office." Therefore the bond of appellant was not breached.

The judgment is reversed, and the case is remanded for further proceedings in harmony with this opinion.