**Eugene JACKSON, Appellant,**

v.

**James WILSON, as Director of Parks and Recreation, Division of the Department of Natural Resources, State of Missouri, Respondent.**

**No. KCD 29588.**

Missouri Court of Appeals,
Western District.

April 2, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 1, 1979.

John J. Schlueter, St. Louis, for appellant.

John D. Ashcroft, Atty. Gen., Reginald H. Turnbull, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

SOMERVILLE, Presiding Judge.

A significant issue of major import lies at the base of this appeal—broadly stated, does James Wilson, as Director of Parks and Recreation, Division of the Department of Natural Resources, State of Missouri (Wilson), wear any cloak of immunity in an action for damages brought by Eugene Jackson (Jackson) for injuries allegedly sustained on or about July 7, 1973, in the St. Francois State Park while diving "into the Big River from a large boulder which was located near an area that was maintained for swimming on the Park's grounds." Jackson alleged he struck his "head and neck" on the bottom of the Big River while so diving and sustained permanent injuries and resultant damages as a direct and proximate result of certain specified negligence on Wilson's part occurring while the latter was acting in his official capacity.

Two silent hypotheses are necessarily indulged by Jackson in formulating his allegations of negligence against Wilson. The first hypothesis indulged purports to fix liability upon Wilson on the theory of respondeat superior because of certain instances of negligence on the part of subordinate employees of the state park system. In this respect Jackson alleges that Wilson's "employees and agents" on the fateful day in question (1) knew or should have known that the river was "too shallow to allow diving in the area" but failed to so warn Jackson, (2) knew or should have known that said "boulder" had been used for diving into the river but failed to warn Jackson of the danger from doing so, and (3) failed to maintain warning signs in the area and thereby failed to warn Jackson of the dangers. The second hypothesis indulged purports to fix liability upon Wilson on the theory that as titular head of the state park system he was guilty of negligently exercising his discretion and judgment regarding the formulation of policies for supervision of the St. Francois State Park. In this respect Jackson alleges (1) a failure to maintain warning signs in the area, (2) a failure to warn Jackson of the danger, (3) a failure to guard said area, (4) a failure to prohibit persons from diving in said area,

(5) a failure to inspect the river, and (6) a failure to barricade the area.

Wilson filed a motion to dismiss Jackson's petition on alternate, multiple grounds: (1) Jackson's cause of action, "in reality", was against the State of Missouri, which in turn was immune from liability under the then (July 7, 1973) reigning doctrine of sovereign immunity; (2) as to that portion of Jackson's cause of action against Wilson predicated upon the latter's purported negligence of a discretionary character while in the course of performing his official duties, Wilson was the beneficiary of the protective mantle of official immunity; and (3) as to that portion of Jackson's cause of action against Wilson predicated upon the purported negligence of subordinate employees of the state park system, Wilson was not vicariously liable because the doctrine of respondeat superior was inapplicable. The trial court sustained Wilson's motion to dismiss without assigning any specific ground or reason for doing so.

Jackson's efforts to rejuvenate his dismissed petition on appeal may be capsulized into three points. One, the doctrine of sovereign immunity afforded no protection to Wilson because it had been abrogated by establishment of the Tort Defense Fund, Section 105.710, RSMo Supp.1975. Two, the doctrine of official immunity afforded no protection to Wilson because it too had been abrogated by establishment of the Tort Defense Fund, Section 105.710, supra. Three, the doctrine of respondeat superior was applicable and Wilson was vicariously liable for the negligence of subordinate employees of the state park system. Wilson urges vindication of the trial court on essentially four grounds. One, the doctrine of sovereign immunity had not been abrogated as of July 7, 1973, and was applicable because the action in question, "in reality" was against the State of Missouri, rather than Wilson. Two, if the action is deemed to be against Wilson individually he stands under the protective umbrella of the official immunity doctrine. Three, Section 105.710, supra, so heavily relied upon by Jackson, abrogated neither the doctrine of sovereign immunity nor the doctrine of official immu-

nity, and even if it had done so, its retroactive application to events occurring in 1973 would violate Article III, § 39(3), Constitution of Missouri, 1945. Four, Wilson may not be held vicariously liable for the purported negligence of subordinate employees of the state park system because the doctrine of respondeat superior is inapplicable.

An ancillary look at the Omnibus State Reorganization Act of 1974, Appendix B, RSMo Supp.1975, is in order to place Jackson's reliance upon the Tort Defense Fund (Section 105.710, supra) in proper perspective. Jackson, as hereinafter noted, professes to be suing Wilson individually in his official capacity as Director of the Division of Parks and Recreation, Department of Natural Resources, State of Missouri. However, at the time of the alleged incident which occasioned Jackson's injuries and the resultant damages claimed, to wit, July 7, 1973, the Division of Parks and Recreation and the Department of Natural Resources, State of Missouri, were non-existent. The Department of Natural Resources was created by Section 10 of the Omnibus State Reorganization Act, supra, which did not become effective until May 2, 1974. The Division of Parks and Recreation was subsequently established by the Director of the Department of Natural Resources pursuant to an initial departmental plan submitted to and approved by the Governor in accordance with Section 1.6(2) of the Omnibus State Reorganization Act of 1974, supra, on June 28, 1974. The text of this departmental plan as submitted is to be found in Appendix C, pp. 1316–1317, RSMo Supp.1975. Prior to submission and adoption of the referred to departmental plan the State Park Board appointed and prescribed the duties of the Director of State Parks. Section 253.060, RSMo 1969. Under Section 10.3, Omnibus State Reorganization Act of 1974, supra, the State Park Board was transferred to the Department of Natural Resources by a Type I transfer. In essence, the newly created Division of Parks and Recreation succeeded to the responsibilities of the former State Park Board. Wilson, who was the Director of

State Parks on both dates in question, to wit, July 7, 1973, and June 28, 1974, became Director of the Division of Parks and Recreation, Department of Natural Resources, State of Missouri, by executive implementation of the Omnibus State Reorganization Act of 1974, supra.

Wilson throughout the course of this litigation has spent an inordinate amount of time advancing the proposition that he individually was not being pursued as a defendant but that the State of Missouri, "in reality", was the sole and only party defendant to the action. Wilson's obsession for doing so has served no edifying purpose as Jackson has repeatedly disavowed the position taken by Wilson by positive assertions to the effect "that the state is not the defendant here", that he (Jackson) "is suing Mr. Wilson individually 'for acts arising out of and performed in connection with (his) official duties in behalf of the State' ", and that "the director of state parks is the named defendant". Disposition of this appeal would be alarmingly simple if the State of Missouri rather than Wilson were the true defendant as the accident complained of occurred at a time, to wit, July 7, 1973, when the doctrine of sovereign immunity was still intact since its abrogation in *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo.banc 1977), operated prospectively only from August 15, 1978.[1]

Both parties have clouded the issues on appeal by indiscriminately co-mingling the doctrines of sovereign immunity and official immunity. Sovereign immunity and official immunity are distinct legal concepts and, as readily suspected, rest on different premises and serve different purposes. The doctrine of sovereign immunity principally rested upon the tenuous ground that the "king could do no wrong", a rare and frankly unexplainable surviving vestige of monarchical power. It served to protect the impersonal body politic or government itself from tort liability. Generally speaking, official immunity, on the other hand, serves as a protective aegis for public officials from tort liability for damages arising from discretionary acts or functions in the performance of their official duties. Its source of sustenance is the variously expressed belief that a vigorous and effective administration of public affairs is best achieved if public officials are freed from the chilling effect of fear of retaliation by way of compensatory damages predicated upon the exercise of their discretion in the conduct of public business; obversely stated, the intimidating effect of an ever present fear of litigation, inimical to the public interest, should be avoided insofar as discretionary functions of public officials in the conduct of public affairs are concerned. *Barr v. Matteo*, 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959); *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir. 1949), cert. denied 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); and Prosser, Law of Torts 987 (4th ed. 1971).

The doctrine of official immunity is no stranger to the law of this state. In *Reed v. Conway*, 20 Mo. 22, 50 (1854), it was articulated as follows: "But a public officer is not liable to an action, if he falls into error in a case, where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion—even although an individual may suffer by his mistake. A contrary principle would, indeed, be pregnant with the greatest mischief." In *Fidelity & Casualty Co. of New York v. Brightman*, 53 F.2d 161, 165 (8th Cir. 1931), involving a suit by depositors against the Missouri Commissioner of Finance and his surety for negligently permitting an insolvent bank to remain in operation, the extant doctrine of official immunity in this state was more definitively explicated as follows: "The Missouri rule is in line with the general run of authority that a public officer charged with discretionary duties is not liable for a mistake of judgment or an erroneous performance of said duties unless he be guilty

---

1. Except for *Jones* and certain other cases raising the issue which were decided concurrently with *Jones*.

of willful wrong in relation thereto, but that as to ministerial duties he is liable for the violation or neglect thereof to the party injured thereby and that a mistake of judgment does not excuse him." Similar expressions of the doctrine are to be found in *State ex rel. Funk v. Turner*, 328 Mo. 604, 42 S.W.2d 594, 598 (1931), *Sharp v. Kurth*, 245 S.W. 636, 638 (Mo.App.1922), and *Schooler v. Arrington*, 106 Mo.App. 607, 81 S.W. 468, 469 (1904). The doctrine of official immunity appears to have been kept alive in *Jones v. State Highway Commission, supra*, the case which sounded the death knell for the doctrine of sovereign immunity in this state, as reflected by the following excerpt from 557 S.W.2d page 230 of the opinion: "We hold that the liability is for torts committed in the execution of activity decided upon, not for the decision itself in matters which go to the essence of governing; that our decision is not meant to impose liability upon the state or any of its agencies for acts or omissions constituting the exercise of a legislative, judicial, or executive function."

■ A ministerial function, as opposed to a discretionary function, has been defined as that "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Yelton v. Becker*, 248 S.W.2d 86, 89 (Mo.App.1952). On the other hand, a discretionary function may be fairly defined as one necessarily requiring the exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued. 62 C.J.S. *Municipal Corporations* § 545.a(1) (1949). When clinically viewed, it becomes readily obvious that ease in verbally espousing the discretionary—ministerial distinction inherent in the official immunity doctrine belies the practical difficulties encountered in its application in certain cases. Therefore, application of the official immunity doctrine is susceptible to the ever-lurking danger of becoming nothing more than a labeling process because of the myopic distinction between the discretionary functions and ministerial functions on the part of public officials in certain given cases. By the very nature of the doctrine of official immunity, vigilance must constantly be exercised to prevent the discretionary—ministerial dichotomy therein from becoming nothing more than a continuum with liability coming down on one side and immunity on the other in an atmosphere completely divorced from factual reality. Though it may be said that the discretionary—ministerial approach is not without its critics, they are best placated by want of a better approach. Placing the distinction in the context of conduct at the decisional stage as opposed to conduct at the implementation stage may deflect some of the shadows presently cast upon application of the official immunity doctrine.

■ A synoptic view of two cases from sister jurisdictions, *Boucher v. Fuhlbruck*, 26 Conn.Sup. 79, 213 A.2d 455 (1965), and *Meyer v. Carman*, 271 Wis. 329, 73 N.W.2d 514 (1955), appears helpful at this point. In *Boucher*, the administratrix of the estate of a deceased minor brought suit against five employees of the city of Hartford for the death of said minor by drowning in a body of water situate in a city park. The grounds of negligence alleged by the administratrix against the five city employees, as disclosed by the petition, consisted of their failure to post warning signs, their failure to barricade the area, and their failure to adequately supervise the area. After approving a definition of ministerial acts substantially similar to the definition adopted by Missouri courts, the court in *Boucher* held that the allegations of negligence leveled against the five city employees arose from their performance of official duties of a discretionary nature as opposed to being ministerial in nature. After drawing this distinction, the court in *Boucher* held that as the specifications of negligence against the five city employees could not be construed as charging them with violation of ministerial duties the common law doctrine of official immunity protected them and their demurrer to plaintiff's petition had

been properly sustained by the trial court. In *Meyer,* a minor fourteen years of age brought suit against the members of a school board in their individual capacities for damages suffered when he fell from a retaining wall located on school premises. The charge of negligence against the school board members was that they failed to keep the school grounds safe, a duty imposed upon them by statute. On appeal, the court in *Meyer,* after engaging in the discretionary—ministerial dichotomy invariably pursued by other courts, held that the negligence charged against defendant school board members bespoke of a duty discretionary in character rather than ministerial in character and concluded, as a matter of law, that a cause of action did not lie against defendant school board members by virtue of their official immunity. As aptly pointed out in *Meyer,* 73 N.W.2d at 515, "[a]t first blush it might appear that the duty to keep the school grounds 'safe' is ministerial in character, but it is apparent on closer analysis that a great many circumstances may need to be considered in deciding what action is necessary to do so, and such decisions involve the exercise of judgment or discretion rather than the mere performance of a prescribed task." *Boucher* and *Meyer* are persuasive authority for the conclusion that those charges of negligence leveled directly at Wilson pertained to conduct of a discretionary character thereby entitling Wilson to claim immunity from liability by reason of the doctrine of official immunity.

At this juncture it is appropriate to look at and consider the Tort Defense Fund, Section 105.710, supra. It should be pointed out that Wilson, in his capacity as titular head of the state park system, was never mentioned or included in the provisions of the Tort Defense Fund, Section 105.710, supra, until it was recently amended in 1974, same being a date subsequent to July 7, 1973, the date of the alleged incident in question. The Tort Defense Fund as most recently amended and presently worded is found in Section 105.710, RSMo Supp.1975, and insofar as here pertinent (after exercising certain public officials foreign to the instant case) reads as follows: "*As part of the compensation to be paid to . . .* the head of state parks in the department of natural resources . . . the commissioner of administration is authorized to pay from the 'Tort Defense Fund', which is hereby created, all final judgments awarded in courts of competent jurisdiction to any claimant against the aforesaid officers . . . *for acts arising out of and performed in connection with their official duties in behalf of the state.* Payment shall be limited to a maximum of one hundred thousand dollars for all claims arising out of the same act . . . ." (Emphasis added.) Jackson has apparently referred to Wilson in the caption and body of his petition in his capacity as Director of Parks and Recreation, Division of the Department of Natural Resources, State of Missouri, in hopes of bridging a patent void inherent in his claim occasioned by the omission of the titular head of the state park system from the Tort Defense Fund, supra, prior to its most recent amendment in 1974.

Jackson strives to convince this court that Section 105.710, supra, as most recently amended and presently existing, retroactively abrogated the doctrine of official immunity with respect to the complained of acts arising out of Wilson's performance of his official duties on the fateful day in question. Jackson's argument fails to wash for the principal reason that the language employed in the statute is unambiguous, conveys a plain and definite meaning, and the legislative intent which prompted its enactment is clearly discernible. When such is the case, this court should and will abstain from foraging among various peripheral rules of construction for the purpose of rewriting a statute under the guise of construing it. *DePoortere v. Commercial Credit Corporation,* 500 S.W.2d 724, 727 (Mo.App.1973). The language employed by the legislature in Section 105.710, supra, does not so much as hint or suggest that the doctrine of official immunity was even being eroded, much less abrogated, retroactively or otherwise. From the time the Tort Defense Fund was

originally created, Section 105.710, RSMo 1967, to and including the time it was last amended in 1974, Section 105.710, RSMo Supp.1975, the General Assembly was obviously aware of a judicial trend abroad the land to chip away at the concepts of both sovereign and official immunity. Notwithstanding Jackson's contention to the contrary, Section 105.710, supra, was not a requiem for the doctrine of official immunity. Instead of attempting to legislatively abrogate the doctrine of official immunity, the General Assembly chose to leave the fate of the official immunity doctrine up to the courts and the Tort Defense Fund was a flexible response to whatever course the courts might take in that regard in the future. Thus, the plain, unadulterated thrust of the Tort Defense Fund was to give greater not less protection to certain named state officials from the consequences of acts performed by them during the course of their official duties. As they were already liable for acts or omissions judicially determined to be of a ministerial nature, abrogation of the doctrine of official immunity, i. e. immunity with respect to acts or omissions falling within the purview of discretionary functions, would substantially increase their exposure to damages, particularly so when perceived in light of the fact that the payment of final judgments qualifying thereunder was limited to a maximum of one hundred thousand dollars. In view of the dollar limitation contained in the Tort Defense Fund it would be no solace to a designated state official to be told that the General Assembly in its benevolence had given him greater job security and protection while at the same time stripping him of the absolute protection previously afforded by the doctrine of official immunity with respect to official acts of a discretionary nature. If the General Assembly had intended such an absurd result it would have been an easy matter for it to have addressed Section 105.710, supra, in terms of the nature and type of official acts falling with the purview of the Tort Defense Fund rather than broadly addressing the matter solely in terms of payment of "final judgments" which necessarily requires a determination of liability by judicial process. The construction heretofore given Section 105.710, supra, subserves rather than subverts the clear legislative intent pervading both the depth and surface of the Tort Defense Fund. This court concludes that legislative establishment of the Tort Defense Fund via Section 105.710, supra, did not abrogate the official immunity doctrine retroactively, contemporaneously or prospectively.

■ Jackson subtly argues that the following language found in Section 105.710, supra, "to pay from the 'Tort Defense Fund' . . . all final judgments", makes the Tort Defense Fund, within its prescribed limits, available to satisfy any final judgment that might be rendered in his favor against Wilson. When the subtlely of this argument is pierced another cogent reason is revealed for rejecting Jackson's claim that Section 105.710, supra, retroactively abrogated the doctrine of official immunity. Indemnification of certain named state officials up to a maximum of one hundred thousand dollars by the payment of judgments rendered against them for "acts arising out of and performed in connection with their official duties" was carefully cast in terms of "compensation to be paid" to them. Section 105.710, supra. To give the Tort Defense Fund a retroactive application so as to provide even limited indemnification to Wilson for acts or omissions associated with past services would run afoul of Art. III, § 39(3), Constitution of Missouri, 1945, which provides that "The General Assembly shall not have power . . . (3) To grant or to authorize any county of municipal authority to grant any extra compensation, fee or allowance to a public officer, agent, servant or contractor after service has been rendered or a contract has been entered into and performed in whole or part;". . . . An awareness of Art. III, § 39(3), supra, obviously guided the drafters of Section 105.710, supra, as evidenced by the fact that they carefully drew it in terms of a perquisite for future services to be performed and not in terms of a perquisite for past services

rendered. In *State ex rel. Cleaveland v. Bond*, 518 S.W.2d 649, 654 (Mo.1975), involving a somewhat analagous situation, the court held that a statute permitting the retroactive payment of retirement benefits to a judge who had ceased to hold office before the statute's ·effective date would constitute the grant of an extra allowance to a public officer after services had been rendered in violation of Art. III, § 39(3), supra.

 Those allegations seeking to fix liability on Wilson for the purported negligence of certain subordinate employees of the state park system are legally sterile if the doctrine of respondeat superior is inapplicable. *Rennie v. Belleview School District*, 521 S.W.2d 423, 425 (Mo.banc 1975), lays to rest any doubt as to the inapplicability of the doctrine of respondeat superior as a vehicle for holding a public officer vicariously liable for the acts or omissions of subordinate public employees. As expressed in *Fidelity & Casualty Co. of New York v. Brightman*, supra, 53 F.2d at 166, a case arising in Missouri against the Missouri Commissioner of Finance, "[i]t is well-settled law that public officers are not responsible for acts of subordinate officials, if such subordinates are themselves employees of the government, where there is no negligence on the part of such public officials in employing them, unless the superior officer has directed or encouraged or ratified such acts, or has personally co-operated therein. . . ." Jackson's attempt to achieve an imperfect application of the doctrine of respondeat superior must fail. It is noteworthy that Jackson makes no claim that Wilson was negligent in hiring the unnamed subordinate employees, or that Wilson directed, encouraged, ratified or personally cooperated in any complained of acts on their part.

Having concluded that the doctrine of official immunity has not been abrogated nor become superannuated, and that the facts decry application of the doctrine of respondeat superior, the vulnerability of Jackson's petition to Wilson's motion to dismiss for failure to state a claim or cause of action becomes self-evident when appropriate and reigning substantive law is superimposed upon the pleaded facts.

Judgment affirmed.

All concur.