**Cichocki v. Mazurek-Smith**

362

*Jeffrey R. Boyd,* for plaintiff.
*Mary C. Crocker,* for defendant.

LASH, *J.,* July 9, 2009—The matter before this court is the petition of plaintiff, Joseph J. Cichocki Jr. (Father), to modify the child custody order entered on November 15, 2004, ·concerning the parties' minor child, Bradley Steven Mazurek, born January 9, 1998. Trial was held on June 9, 22 and 26, 2009. We enter the following findings of fact:

# I. FINDINGS OF FACT

(1) Plaintiff, Joseph J. Cichocki Jr. (Father), is an adult individual who currently resides at 1230 North Reading Avenue, Bechtelsville, Berks County, Pennsylvania 19505. Father resides in the Boyertown Area School District.

(2) Defendant, Kerri L. Mazurek-Smith (Mother), is an adult individual who currently resides at 529 West Second Street, Birdsboro, Berks County, Pennsylvania 19508. Mother resides in the Daniel Boone Area School District.

(3) The parties are the natural parents of a minor child, Bradley Steven Mazurek, born January 9, 1998.

(4) Father was remarried on May 2, 2002. He currently resides with his wife, Jennifer, the couple's daughter, Hailey, age 6, and Jennifer's two children, Nicholas, age 18, and Kaitlyn, age 13.

(5) Mother has also remarried. She currently resides with her husband, Gregory Smith. The couple have two minor children, Madison, age 7, and Dylan, age 5.

(6) Father is employed at Controllex Service Corporation as a service technician, working full-time with flexible hours but generally weekdays from 7 a.m. to 3 p.m.

(7) On November 15, 2004, after trial held, the Honorable Arthur E. Grim entered a memorandum opinion and order in disposition of the parties' complaint in custody. Judge Grim ordered that the parties would share legal custody of the minor child, that Mother would have primary physical custody, and that Father would have

partial custody such that during the school year, Father would have the minor child every other weekend from Fridays at 5 p.m. to Sundays at 6 p.m. and would also have the Thursday following Father's weekend from 5 p.m. until the following Friday morning. During the summer months, the parties would alternate custody weekly with the transfer of the minor child to occur on Fridays at 7:30 p.m. This arrangement is generally honored by the parties, except that Father, by agreement, does not request the minor child for his Thursday, believing that it is less disruptive for the minor child if he remains at his Mother's for all weekdays.

(8) Also contained in the custody order was a provision for the appointment of Edward Hanna D.S.W., as a mediator/arbitrator. Paragraph 14 states:

"(14) Unless otherwise agreed upon, Dr. Edward Hanna is appointed mediator/arbitrator to resolve any conflicts which arise between the parties regarding the minor children. If after mediation a resolution cannot be reached, the decision of the mediator/arbitrator is final except that each party shall always have recourse to petition the court to determine the child's best interests in the event he or she believes that the arbitrator's decision is *clearly* not in the child's best interest. If the court finds that recourse to the court was unreasonable, then counsel fees shall be awarded against that party. Father shall pay 50 percent and Mother shall pay 50 percent of the cost of mediation/arbitration unless the mediator/arbitrator believes that a party was unreasonable, in which case the court may assess the costs against one or the other party in a different proportion."

(9) Since the entry of the order, the parties have engaged Dr. Hanna in several mediation and arbitration sessions. The subject of one of the arbitrations concerned Father's request that the minor child be tested and evaluated for possible attention deficit/hyperactivity disorder. The testing and evaluation was permitted to proceed.

(10) The minor child was diagnosed with Attention Deficit Hyperactive Disorder (ADHD) in 2005. He was prescribed Adderal X-R, 20 mgs., once a day. This condition also made the minor child eligible for an individualized education program (IEP) at school.

(11) The minor child also suffers from tic mannerisms and has been prescribed Orap for the condition.

(12) At all times, this minor child has matriculated at Daniel Boone. He recently completed the fifth grade at the Birdsboro Elementary School.

(13) In third grade, an IEP was established for the minor child at the Birdsboro Elementary School, which has been modified from time to time.

(14) Father raised concerns that Daniel Boone was not following the IEP program. He noted that the minor child has done poorly on the National Standardized tests. This was in contrast to his grades from Daniel Boone, which were always As and Bs. Father also complained that Daniel Boone refused to send the minor child's records to him and that the minor child was missing assignments because the special education teacher was not properly following the IEP requiring that the teacher ensure that assignments were properly handed out and completed.

(15) At Father's initiative, the minor child enrolled in the Sylvan Learning Center program. He was initially enrolled during first grade for the 2004-2005 year, then again in June of 2008. At Sylvan, the minor child received individualized instruction, which resulted in him obtaining improved standardized test scores.

(16) The minor child also received counseling through Progressions from September of 2005 through April of 2008. He counseled with a behavior specialist consultant to address issues with his conduct, both at home and at school. According to the behavior specialist, the minor child responded and eventually services were no longer required.

(17) Because of Father's concerns that Daniel Boone was not properly addressing the minor child's needs, he initiated an arbitration proceeding resulting in a "decision" entered by Edward P. Hanna D.S.W., dated March 14, 2009, setting forth the following:

"The following arbitrated decision is pursuant to, and in accordance with, the standing custody order of the Honorable Arthur E. Grim, Judge, Berks County Family Court, signed November 16, 2004, paragraph 14, to wit: 'Unless otherwise agreed upon, Dr. Edward P. Hanna is appointed mediator/arbitrator to resolve any conflicts which arise between the parties regarding the minor children. If after mediation a resolution cannot be reached, the decision of the mediator/arbitrator is final . . . .'

"(1) As soon as it can be arranged, the parent's son, [minor child] (d.o.b. 01/09/98) will transfer from his 5th grade class in Daniel Boone School District to a 5th grade

class at Colebrookdale Elementary School in the Boyertown School District, PA.

"(2) [Minor child] will attend 5th grade at the Colebrookdale Elementary School until the end of the current school year, June 2009.

"(3) Upon the transfer, [minor child's] residence shall be recognized as that of his father, who is a taxpaying resident of the Boyertown School District.

"(4) Upon completion of his last day of school, June 2009, [minor child] will re-assume his residence with his mother and parents will follow the existing parenting plan for summer.

"(5) The parents will work together to support their son during this transitional period. Both will insure, within reason and capacity, frequent and consistent contact between Mother and son, including daily involvement after school, assistance with homework and participation in appointments and recreational activities.

"(6) This decision is made only for the welfare of [minor child], to insure that he has the opportunity to access educational supports responsive to his needs. This decision is temporary in nature and nothing about it should be construed as representing now, or in the future, any intent to change the standing custody order."

(18) On or about May 12, 2009, Father filed the within petition to modify custody requesting a transfer of primary custody to him to enable the minor child to attend the Boyertown School District and upon Father's belief that the minor child would prefer to reside with him.

(19) Because the primary issue in Father's petition is the request to have the minor child change schools, which if granted, would optimally occur at the commencement of a school year, which in this case, would be late August 2009, this court granted the parties' request for an expedited trial.

## II. DISCUSSION

In making disposition, this court reviewed the testimony of the parties, the testimony and report of Edward P. Hanna D.S.W., the testimony of Father's wife, Jennifer, Shelly Mieczkowski, director of special education at Daniel Boone, Tom Hankel, the principal of Daniel Boone Middle School, Debra Schlegel, the minor child's special education teacher for fourth and fifth grade at Birdsboro Elementary School, Edward Myers, the behavior specialist consultant, Michael Sands, franchisee from Sylvan Learning Center, Lisa McCullough, school psychologist for Daniel Boone, Thomas Shugar Ed.D., the principal for the Colebrookdale Elementary School in the Boyertown Area School District, Karen Hipple, the director of special education for the elementary schools in the Boyertown Area School District, and the exhibits submitted by the parties.

Father's decision to request a modification of the custody order arises from his perception that the education provided to the minor child by Daniel Boone has been insufficient. He raises several issues. First, Father points to the test scores obtained by the minor child on his standardized tests. This court was provided with test results from the "Iowa Test" for the minor child's third, fourth, and fifth grade years. For third grade, the minor

child received an overall national percentile rank of 23 percent. Although he was in third grade, his reading comprehension was scored 2.4, meaning he was reading at approximately the same level as a second grade student at approximately the midpoint of the school year. Similar scores were obtained for language and mathematics. For fourth grade, the minor child's results were worse. His national percentile rank was 12 percent. His reading comprehension was 2.2, and the overall reading score was 2.9. His mathematics overall score was 2.7. In fact, most of the indicators assessed the minor child's abilities at a second grade level. When the minor child tested in fifth grade, his scores did improve. His national percentile rank was up to 32 percent. His overall reading was 4.2 and his reading comprehension was 3.8. His overall language skill was in the 27 percentile at 3.8. His overall math score was 4.9, which was in the 44th percentile.

Father believes these test scores cannot be reconciled with the good grades he was receiving from the teachers at Daniel Boone, namely As and Bs. He perceives that the standardized test scores establish that the minor child has been struggling and that his grades are inflated, either through extra credit or because the teachers are "pushing through" the minor child into the next grade. In either event, Father believes that the grades are not a true barometer of the minor child's work at school and that Daniel Boone is not committed to properly educating the minor child. Father attributes the improved standardized test scores during the minor child's fifth grade year to the minor child's involvement with Sylvan Learning Center.

Father's second objection relates to his perceived inattentiveness of the special education teachers. Recently, the minor child had four assignments which were not completed on time. Father opines that this should never have happened because the IEP requires that the special education teacher provide the child with the assignment and make a notification in his assignment book, in writing, that he has received the assignment from the teacher and that he has completed the assignment. In essence, Father posits that the special education teacher is not following Daniel Boone's own IEP. Secondly, Father believes that the school does not provide a learning support teacher for the minor child as often as is necessary. Third, the minor child has exhibited extreme stress during math tests, to the point of losing his composure.

Finally, Father objects to Daniel Boone's apparent refusal to provide him with school records. He states he has requested the records on numerous occasions, but he is denied, based on Daniel Boone's policy that only the parent with primary custody is entitled to receive the records, and it is up to the custodial parent to provide the records to the other parent. He complains that Mother does not forward any records to him, even though he continuously requests them from her.

Father believes that the minor child's interests cannot be served by Daniel Boone and that he should be transferred to another school. As Father resides in the Boyertown Area School District and is satisfied with their program, he requests a change in custody.

Father also raises concerns about Mother's care. He believes that she is inattentive to the minor child's needs. For example, the minor child was found to suffer from

asthma and had a problem with his adenoids. These issues were not properly addressed by Mother or her physician and were not diagnosed until Father sought recourse through arbitration, then received permission to take the minor child to a doctor of his choice. Regarding the school issues, Mother initially opposed having the minor child evaluated and tested, and with the minor child receiving special education services and an IEP. If not for Father's intervention, the minor child would not have been diagnosed with the ADHD condition or prescribed medication, and would have been assigned by Daniel Boone to the regular classes, where he would have had substantial difficulty.

Father does agree that if it were not for the problems with Daniel Boone, he would have no objection to continuing with the current custody schedule. He believes that the current schedule serves the minor child well and if the minor child could attend Boyertown School and remain in Mother's care, that would be acceptable to him.

Mother seeks to retain primary custody, keeping the current schedule. She believes she provides a good home for the minor child. The minor child has a good relationship with his stepfather and half-siblings. She supports the minor child, attending his activities and supervising his school work. She is active with the IEP and other parent-teacher conferences. She makes sure the minor child's homework is done appropriately. Regarding the minor child's ADHD and behavioral issues, she oversees his needs, including his medications, previously taking him to the behavioral specialist, or to the Sylvan Learning Center, where she shares the costs with Father. While

she initially opposed some of Father's initiatives, she ultimately accepted the benefits, and has been an active participant.

According to her, the problems that surface stem from Father's overbearing, authoritarian nature. She complains that Father makes up his mind on an issue and will not consult or discuss the matter with her. He puts pressure on her and the minor child to comply with his directives. She feels that she is unable to be heard. As a result, she resists, creating opposition between the parties. This opposition had to be resolved by the arbitrator on several occasions.

Regarding the school issue, she believes that Daniel Boone will provide adequate educational services for the minor child. If he remains at Daniel Boone, he will begin attending the middle school, who will oversee the IEP and make whatever adjustments are necessary. She also points out that she has been satisfied, at least since March of 2009 that the elementary school has done everything that is necessary to address the minor child's needs.

Pertinent to the within matter is an e-mail sent from Mother to the school district, dated March 3, 2009. In that correspondence, Mother advised Daniel Boone that "I am unhappy with a few points in my son's education and worry for my two other children . . . . I feel that [minor child] is being 'pushed' through and may not be getting everything he needs." According to the e-mail, she perceived that the minor child is doing "C work" with weak sentence structure and vocabulary usage and wonders, like Father, whether the grades are inflated. Additionally, she believes that the teachers were permitting the minor child to manipulate them and that they

would give him a "pass" rather than insist that all requirements be met. She is also concerned about the problems in communication between the school and Father. She requested a weekly communication with teachers, including work samples, and progress reports be completed. Secondly, bi-weekly ADHD monitoring reports should be filled out and sent to Father. She additionally requested a reading specialist evaluate the minor child to provide a comparison with the other children in his class, among other things.

After this e-mail was sent, Mother testified that Daniel Boone responded and that she is now satisfied that the minor child's interests are being met.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

Initially, we must address the scope of Dr. Hanna's involvement as a mediator/arbitrator. As stated, the previous court order had appointed Dr. Hanna to "Resolve any conflicts which arise between the parties regarding the minor children." The order goes on to provide that if a resolution cannot be reached after mediation, the decision of the mediator/arbitrator is final. Further, if a party believes that the decision is "clearly not in the child's best interests," then that party can file a petition with the court, however, if the court determines that recourse to

the court was unreasonable, then counsel fees would be awarded against the moving party.

In fashioning this order, the previous trial court evidently attempted to try to find a workable solution to address the intractability of the parties on any custody issues that may arise. While this directive was issued in good faith and did provide a vehicle enabling the parties to work through their differences, the provision nevertheless cannot be enforced, particularly in a situation where the mediator/arbitrator is ruling that a change in physical custody shall take place. While the Supreme Court through the Rules of Procedure has permitted limited delegation of judicial authority to address ancillary custody matters, delegation is improper where the decisions involved would determine court issues for legal, physical or shared custody. *Yates v. Yates,* 963 A.2d 535, 540-41 (Pa. Super. 2008). Secondly, a court may not impede the right of a party to seek redress on custody issues by providing a sanction against a party who seeks court intervention and is unsuccessful. As stated by the Pennsylvania Superior Court, citing *Kassam v. Kassam,* 811 A.2d 1023, 1025 (Pa. Super. 2002):

"Child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child. The Commonwealth has a duty of paramount importance, to protect the child's best interests and welfare. To that end, it may always entertain an application for modification and adjustment of custodial rights."

Accordingly, paragraph 4 of the previous court's order of November 15, 2004 must be stricken, Dr. Hanna's decision of March 14, 2009, and his testimony taken by

this court shall not be considered in making disposition.

As stated, Father has framed the issue to be whether Daniel Boone is sufficiently addressing the minor child's educational needs. However, in the context of the minor child's best interests, a bigger issue is present, namely, the dynamics of the parties. Unfortunately, the parties have a long and difficult history, which includes distrust, name calling, and non-cooperation. It is apparent that the previous court was fed up with these parties, prompting the controversial arbitration provision in its order. Over four and one-half years have passed since the court entered that order, and the parties still do not seem to get it.

The primary dynamic here stems from Father's hypercritical nature and Mother's defensive responses. Father, as well as his wife, who supports him, are very adept at finding fault with Mother, with the Daniel Boone School District, and of others who do not agree with their position. Father's method is to create tension in order to force his agenda. Mother's response is to put up a wall and to become defensive. Mother's refusal to respond creates an impasse. Were it not for the arbitrator's availability, it is questionable whether anything productive would have gotten done on behalf of the minor child.

An example of this dynamic appears in an e-mail sent from Father's wife to Mother's husband, dated August 20, 2007, where she states, among other things: "Once you tell [Mother] she is wrong she stops listening . . . ." [1]

---

1. The overall content of this e-mail is extremely distressing to this court. It can only be described as obnoxious and ignorant, conveying

While this statement correctly points out Mother's unproductive and unhelpful response, it also illustrates the importance Father's camp places on being "right" and pointing out that the other camp is wrong, an unfortunate and misguided perspective when interacting with another parent.

Another example is Mother's e-mail to the school district of March 3, 2009. Her petition to Daniel Boone to make changes appears to be based more on her concern that she could lose custody if changes are not made, rather than for the best interests of the minor child. In essence, she is saying: "I agree with some of what Father is saying but not all of what he is saying, but if you don't make the changes, I could very likely lose custody."

If the goal is to be what is best for the minor child, it is imperative that the parties make every effort to work together, to establish a harmonious relationship. Even if the issues involving the minor child are ultimately resolved in an appropriate manner, when the journey is acrimonious, the minor child will suffer. This concern is magnified when the minor child suffers from ADHD, as is the case here.

Fortunately, the parties have agreed to the appointment of a parent-coordinator, which shall take place by separate order. Hopefully, the coordinator will be able to facilitate the interaction of the parties. Beyond that, this court believes that co-parenting counseling is imperative. The parties need to begin understanding the other's point

---

an attitude which substantially contributes to the disintegration of the relationship between the parties and harm to the minor child.

of view,[2] which will hopefully soften their stance against each other and benefit the minor child.

The aforesaid acrimony spoils what would otherwise be appropriate parenting. Father has established that he is very concerned with the minor child's issues, and invested in working to a solution. He pushed for an investigation to obtain the eventual ADHD diagnosis. He sought and obtained an independent solution for the educational issues through the Sylvan Learning Center, at substantial cost. If he would learn to use diplomacy to implement his ideas, rather than simply declaring war when he finds opposition, he would likely achieve the same results, but with much less aggravation.

Mother has also shown the capacity to be a good parent. As stated, Father has no issues generally with Mother's care. Further, while initially reluctant, she has ultimately accepted Father's ideas and has supported them, including providing financial support where necessary, such as with Sylvan Learning Center.

---

2. This is not the first time these parties are hearing this plea. In the BHRS treatment plan, (plaintiff's exhibit 13), it states: "Communication and congruency between parties is necessary to create a single 'united front' while influencing behavioral change. Compromise between Mother and Father will be necessary in creating this 'united front.' Additionally, taking into account each other's perspectives will be imperative if congruency is to be achieved. BSC feels that both Mother's and Father's viewpoints hold merit. BSC feels that this is not an issue of 'right and wrong,' but simply being at different points on the behavioral modification spectrum. . . . Quite simply, there are two different styles being imposed by each parent. This is why compromise and acceptance between the parties will be necessary in working toward behavioral change."

We turn then to Father's issue with Daniel Boone. Daniel Boone's IEP was first implemented for the minor child in third grade, after his ADHD diagnosis. The IEP proposes to provide a tailored individual program, best suited to meet the child's needs. The plan is formed among several individuals, including the parents, designated persons from the school district, and others, such as a school psychologist, and in this case, the behavioral specialist. The hope is that a consensus can be reached among the individuals on the best method to provide a suitable education for the child.

Allowances within an IEP may include reading a test aloud rather than providing it in writing, providing extra time to work on assignments, providing individualized checks with the teachers to make certain assignments are understood and are completed, review for understanding, and other such methods. Over the course of time, the teachers observe what is needed and what isn't, what works, and what doesn't work. Adjustments are then made after discussion among the participants in the IEP.

Whenever possible, the individual instruction is administered conservatively. Caution must be taken because of the potential stigma that can attach, both in the child's mind and in the mind of his peers, that the child is "not as smart" as his peers or is "special ed". For that reason, both Daniel Boone and Boyertown favor an "inclusion" policy, providing the child with an IEP which is included in mainstream learning with the body of students whenever possible. A special education teacher will be provided when necessary, while at other times, an aide may be present in the main classroom. Daniel Boone

identifies IEP students taking instruction in the main classroom with some support as "itinerate."

This is consistent with the "least restrictive environment" concept required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 et seq. One commentator succinctly explains the concept:

"Under IDEA, an 'appropriate education' is a series of services described in an Individualized Education Plan, which is reasonably calculated to afford meaningful educational progress in a least restrictive environment. *Oberti v. Board of Education,* 995 F.2d 1204 (3d Cir. 1993); *Polk v. Central Susquehanna Intermediate Unit,* 53 F.2d 171 (3d Cir. 1988). In *Oberti,* the Third U.S. Circuit Court of Appeals emphasized the importance of placement in the least restrictive environment possible, *i.e.,* programming with nondisabled peers with adequate supports to allow for meaningful progress. The *Oberti* court emphasized that IDEA's insistence upon placement in the least restrictive environment is based upon a recognition that integration of individuals with disabilities into the mainstream of society and school environments produces social and behavioral benefits for children with disabilities, while allowing them to make meaningful academic progress through proper supports such as classroom aides and the intervention of specialists and therapists. Indeed, the mandates of a least restrictive environment are of such import that even if the child could realize greater academic progress in a more restrictive setting, the school district is required to offer placement in the least restrictive environment.

"In pursuit of least restrictive environment mandates, each public agency must ensure that children with dis-

abilities are educated to the maximum extent appropriate with nondisabled children and that removal of children from the regular education environment should occur only if the nature and severity of the disability is such that education in regular classes with the use of supplementary aides and services cannot be achieved satisfactorily. 34 C.F.R. §300.114(a)(2)."[3]

The difficulty in determining how extensive the IEP should be is one of the bones of contention between the parties. Mother has consistently been reluctant to agree to provide any more special education than what is absolutely necessary. Father, on the other hand, appears to be only concerned with providing whatever is necessary.

The Daniel Boone representatives observed the minor child's issues to be primarily behavioral. He is prone to putting pressure on himself, attempting to achieve a perfect score. When he is confronted with a difficult assignment or test question, the pressure he puts on himself may cause him to become emotional. He is also affected by the length of the test and, particularly, a test which must be done within a certain time frame. In essence, he manifests difficulty in maintaining his concentration and becomes easily frustrated.

The IEP currently calls for the minor child to be included with the main group of students, with the "itinerant" designation. His special education teacher is called upon to prepare his assignments, particularly in reading

---

3. Lukach Bradley, Jennifer M., "Staying in the Mainstream", *The Pennsylvania Lawyer,* July/August 2009, volume 31, no. 4, pp. 39-41.

and language skills, to make certain that he understands them, and to make certain that they are completed. He has received allowances, permitting test questions to be read aloud or for extensions of time. From Daniel Boone's standpoint, the minor child is currently doing well.

Regarding Father's complaints, his first concern that the minor child's standard test scores are poor and are inconsistent with the grades he achieved at Daniel Boone is a bald assertion without any explanation from the evidence. In fact, the only explanation provided for the discrepancy between the test scores and the grades was that provided by the school psychologist. The psychologist testified plausibly that the minor child's intelligence level was adequate and that the difficulty the minor child has with tests and assignments are behavioral, based on his inability to concentrate and his heightened frustration. The standardized test process can be unforgiving; if a child has difficulty completing tests on time, or retaining his concentration, he may score poorly, even though he has sufficient intelligence and knowledge to answer the questions correctly. According to the psychologist, when allowances are provided, the minor child can achieve well. Accordingly, she found no inconsistency between his test results and his grades.

The second concern was whether assignments were being completed on time and whether the special education teacher was properly checking the assignments. There were four assignments missed. These were not homework assignments, however, but were classroom assignments, unable to be completed by the minor child because of his difficulty with completing assignments

on time. The special education teacher was well aware of the four assignments and made allowances. This was not an example of inattentiveness, but rather whether the teacher's method was adequate under the circumstances.

There was also a related issue regarding whether assignments should be signed out in writing, otherwise, there is no written proof that the minor child received his assignment and understood same. The written assignment requirement was eventually incorporated into the IEP. Previously, the IEP was silent on such a requirement. The special education teacher testified that she would provide verbal confirmations, partially due to time constraints. She was satisfied that the minor child could understand the assignment and would complete it in a proper manner. This objection appears to be an objection after the fact, meaning that it was not discussed during IEP until after an issue arose. This is why meetings need to continue to be held so that the IEP can be adjusted where necessary. This also reflects the different perspectives of the parties and the school. Father wants a "hands on" approach, a type of micromanagement, leaving nothing to chance. Neither Mother nor the school district thought this was necessary until Father raised objections, then adjustments were made.

The level of support provided also reflects the different perspectives. Daniel Boone's explanation that an aide is present in the classroom at certain times, and whenever necessary, appears to be sufficient. Again, while the primary goal is to provide the minor child with instruction that enables him to achieve, which must be individualized when necessary, there is also a secondary goal

of maintaining normalcy in the classroom for the minor child whenever possible. Father has not established that the balance struck by Daniel Boone was improper.

On the third issue, we agree with Father that communication could have been better. There is no reason why Daniel Boone could not have provided the school records to Father as they did with Mother. The policy to provide only the custodial parent with the records may be economical for the school district, but can lead to a host of problems, particularly when parents of a child are not communicating. Here, it was clear to all involved that Father was very invested in the minor child's educational concerns. Much of the problems and mistrust could have been avoided if Father had simply been provided with the school records. That being said, it appears that this issue is moot, as the Daniel Boone Middle School has a different policy, agreeing to provide each parent with the necessary school records, simply requiring each parent to fill out the appropriate forms.

This court is not satisfied that Father has established that Daniel Boone's methods or implementation of those methods were insufficient. To warrant a change in custody solely for the purpose of switching school districts would require that the current school district is not acting in the minor child's best interests. For reasons set forth, the only criticism that is supported by the evidence is the failure to provide school records to Father. While this is certainly a basis for Father's frustration, we see no nexus between this problem and the sufficiency of the minor child's education.

That being said, when this court reviews the totality of the circumstances, it appears that a change in custody

is warranted. Throughout the minor child's educational life, Father has responded promptly, providing feasible solutions for the special needs issues that were being uncovered. Mother, on the other hand, has been historically resistant to addressing these problems, requiring these important decisions to be made by the appointed arbitrator. We must stress that the issues raised were of fundamental importance. Where would the minor child be if he had not been properly diagnosed as ADHD, receiving treatment and medications, and being afforded access to an IEP, behavioral specialist, and additional aide through the Sylvan Learning Center? While some children may thrive in a laissez-faire parenting approach, such as Mother provided, this minor child needed intervention.

Secondly, we observe this minor child, who is diagnosed with behavioral problems and has historically been resistant to authority, is rapidly approaching the age of puberty. Mother has already experienced some issues with control which will likely increase when the minor child becomes a teenager. The behavioral specialist noted that the minor child is better behaved in Father's household. We feel that Father is better equipped to provide the necessary proper structure. We do caution, however, that Father's methods, as already stated, can be very demanding and heavy-handed. If he continues in this manner, his method could likewise be harmful to the minor child as it could create avoidance or confrontational responses in the minor child. It will be necessary for Father to learn to "work with" the minor child, not "make demands to" the minor child. We believe that it is easier for Father to adapt to become more concilia-

tory than it is for Mother to acquire the authoritative status she will need.

Third, the impact on the minor child from a change in custody would be minimal at this time. Currently, the parties share custody during the summer months on a week on, week off, basis, providing the minor child with the opportunity to spend substantial time with each parent and in each parent's household. In essence, the change would only affect weeknights during the school year. Additionally, in either household, the minor child will be starting school in the fall in a new setting, with a new IEP.

Fourth, Mother's greatest concern with a change in custody, that she would "lose her voice as a parent," will be properly addressed. Mother believes that if Father would have primary custody that he would take full control of all aspects of the minor child's life and would "shut her out." However, assuming Father has this propensity, Mother's concerns will be adequately addressed by the parent coordinator. Certainly, if there are any major issues, the court would become involved.

We enter the following order:

## ORDER

And now, July 9, 2009, after trial held, custody of the parties' minor child, Bradley Steven Mazurek, born January 9, 1998, shall be as follows:

(1) The parties shall share legal custody.

(2) The parties shall share physical custody of the minor child during the summer, with the parties to transfer custody every Friday at 7:30 p.m.

(3) During the school year, plaintiff, Joseph J. Cichocki Jr. (Father), shall have primary physical custody.

(4) During the school year, defendant, Kerri L. Mazurek-Smith (Mother), shall have partial custody as follows:

(A) On alternate weekends from Friday at 5 p.m. to Sunday evenings at 6 p.m.; and

(B) Every Tuesday commencing after school until Wednesday morning when Mother will take the minor child to school, and at such other times as the parties shall agree.

(5) Each party is entitled to one week of vacation with the minor child during the summer. Each party shall select as his or her vacation week one of that party's custodial weeks. However, instead of ending on the following Friday, the party may retain custody until 7 p.m. on the following Sunday. Each party shall give the other party 60 days written notice as to his or her selection under this paragraph. Father's selection has priority in even-numbered years; Mother's selection has priority in odd-numbered years.

(6) Father shall provide transportation for the minor child to and from periods of partial physical custody unless the parties agree otherwise.

(7) The parties shall alternate custody of the minor child on the following holidays: Easter, Memorial Day, July Fourth, Labor Day, and Thanksgiving. Mother shall begin with Labor Day in 2009, and the parties shall alternate the holidays thereafter. Custody for the holidays shall be from 10 a.m. until 7 p.m. If a holiday falls on

the Monday following Father's weekend period of partial custody, Father may retain the minor child that Sunday night.

(8) Notwithstanding the foregoing, Mother shall have physical custody for Mother's Day and Father shall have physical custody for Father's Day each year. Custody shall be from 10 a.m. until 7 p.m.

(9) In odd-numbered calendar years, Mother shall have physical custody of the minor child from 12 noon on December 24 to 12 noon on December 25, and from 3 p.m. on December 31 to 6 p.m. the next day, January 1. Father shall have physical custody from 12 noon on December 25 to 6 p.m. on December 26. In even-numbered calendar years, Father shall have physical custody from 12 noon on December 24 to 12 noon on December 25, and from 3 p.m. on December 31 to 6 p.m. the next day, January 1. Mother shall have physical custody from 12 noon on December 25 to 6 p.m. on December 26.

(10) Both parties shall be listed on all school, medical, dental, activity or other records. Father shall provide Mother with a timely copy of all school calendars, notices of activities, parent-teacher conferences, and so forth.

(11) The parent having physical custody of the minor child shall make reasonable efforts to maintain an open telephone line in his/her home from 7:30 p.m. until 7:50 p.m. each evening so that the minor child may place calls to, or receive calls from, the other parent. Neither party shall use caller I.D., call block, or any other device or service which prevents or restricts access to the minor child or the other parent. In the event the minor child is

unavailable to receive calls during the designated time, the parent having custody shall use an answering machine or voicemail to record any messages from the other parent. The parent having physical custody shall inform the minor child of any missed calls and shall encourage the minor child to (1) regularly phone the other parent at the designated or other convenient time; and (2) promptly return any missed calls to the other parent. The minor child shall be permitted to speak at least 10 minutes with the other parent if the minor child so desires.

(12) Both parents shall provide each other with at least two weeks' advance notice of non-emergency medical and dental appointments for the minor child to permit the other the opportunity to be present at such visits. In the event a parent is unable to be present at a visit, the participating party shall promptly communicate to the other party any health issues, illnesses, immunizations, treatments, medications, etc.

(13) Neither party shall disparage nor denigrate the other parent in the presence of the minor child, nor permit others to do so. Each parent will try to encourage the development of the parent-child relationship between the minor child and each parent.

(14) This court, by separate order, shall appoint a parent-coordinator, by agreement of the parties.

(15) The parties shall participate in co-parenting counseling with the costs to be shared. The parties shall choose a counselor and if an agreement cannot be reached, the counselor shall be appointed by the court.

(16) The attached appendix shall be made a part of the within order.

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the

presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa. R.C.P. 1915.12.